485 S.E.2d 112

The STATE of South Carolina, Respondent,

v.

Larry MORGAN, Appellant.

No. 2653.

Court of Appeals of South Carolina.

Heard Nov. 7, 1996.

Decided April 7, 1997.

Rehearing Denied May 22, 1997.

504

Albert V. Smith, Spartanburg, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh,. and Assistant Deputy Attorney General Salley W. Elliott, Columbia; and Solicitor Holman C. Gossett, Jr., Spartanburg, for respondent.

HOWELL, Chief Judge:

Larry Morgan was found guilty of first degree criminal sexual conduct with a minor and was sentenced to thirty years imprisonment. He appeals, arguing that the trial court erred in admitting two expert opinions that lacked the proper basis of scientific reliability. We affirm.

## I.

The victim (Morgan's step-granddaughter and age ten at trial) testified that when driving her home on February 5, 1994, Morgan "stopped on the road and he got out of the seat and walked over to me and he unzipped his pants, pulled out his private part and put it in mine." She stated that she sat upright in the vehicle seat for the entire time, and Morgan lay on top of her and moved up and down for about ten minutes. The child also testified that she told Morgan "he was hurting

me, but he said tough luck." She also stated that Morgan had sexually abused her between five and ten times before the February 1994 incident, beginning when she was four or five. Morgan's attorney questioned the child about details of the event and who she told, but he did not otherwise cross-examine her about her post-incident behavior.

A physician, Dr. Jan Porter, was qualified as the State's expert in "the field of family medicine and the field of sexual abuse and the recognition of those characteristics, traits, and behavioral symptoms exhibited by victims of sexual abuse." Porter was offered to give an opinion that "yes, the child has been sexually abused even though there is no medical evidence." She first examined the child on March 1, 1994, and the child informed her that someone had touched her in her private areas on a "number of occasions." Porter stated the child's behavior was normal during the examination, except when she commenced the genital area examination, when the child became anxious and frightened and was unable to hold still. Porter abandoned any effort to try to examine her genitalia that day, gave the mother a sedative for the child, and examined her three days later. She examined the child's genitalia during this second visit and "[e]verything looked totally normal."

Porter testified that her "job as a physician is to be an advocate for" her patients. In her opinion, Porter "certainly could not rule out any sexual abuse with this exam," and her examination and observation of the child were consistent with sexual abuse. On cross-examination she testified that there is no behavioral pattern that "is absolutely diagnostic without a doubt of sexual abuse." She stated that though the physical examination neither proved nor disproved sexual abuse, there were "behavioral patterns" that made her highly suspicious, and the child's behavior itself was physical evidence that made her suspicious. Her opinion was "based partially on subjective data and is based partially on my objective observation of her behavior." Porter stated that there was no single, specific finding which influenced her opinion, rather, "[i]t was the constellation of what the child told me in her history, her behavior on two occasions when I examined her and the fact that with her exam being totally normal it did not exclude her description of what occurred." Porter stated that she did not

validate the child's story, nor was she able to recall the names of the authors or studies she partially relied upon in arriving at her conclusion.

Sharon Crenshaw was qualified as the State's "expert mental health counselor in the field of evaluation and treatment of sexually abused children and posttraumatic stress." Her testimony was offered to prove that the child exhibited behavioral symptoms consistent with posttraumatic stress disorder (PTSD), rape trauma syndrome (RTS), and sexual abuse. Crenshaw stated that she has a bachelor's degree and a master's degree in special education, and she is employed as a licensed professional counselor. Although certified as a school psychologist and chief mental health counselor, Crenshaw considered herself a counselor and a psychotherapist, rather than a psychologist, and as such, there are "not really areas of expertise. In order to be licensed you have to prove your competency in several areas." Crenshaw testified that she did not videotape nor use structured techniques; instead, her methods included interviewing the child, observing the child's symptoms and behaviors, and looking at the child's drawings. Finally, she stated that she had experience working with DSS and the State "in actually questioning children in determining whether they are being truthful, or not."

Crenshaw saw the child on four occasions between July and December 1994. Based on her conversations with the child and her mother, Crenshaw recommended that she work with the child "on decreasing her distress symptoms." She "also referred [the child] for group therapy for sexual-abuse victims within her age range." Crenshaw testified that the child reported to her a sexual assault that occurred inside a van. Crenshaw described some of the symptoms of PTSD, described the child's behavior problems, and diagnosed the child as having "numerous symptoms of posttraumatic stress syndrome." In Crenshaw's opinion, the child "exhibited characteristics consistent with being sexually abused."

The trial court overruled Morgan's various challenges to the expert opinions, holding that any defects went to the weight but not admissibility of their testimony, and any weaknesses could be brought out on cross-examination. While the court did not limit the purpose, it did limit the form of each expert's

testimony. Neither expert gave an outright conclusion of sexual abuse or PTSD, but used only "consistent with" language.

## II.

Expert testimony concerning child abuse typically comes from two sources: medical evidence provided by physicians and behavioral science evidence provided by psychiatrists, psychologists, and social workers. John E.B. Myers *et al.*, *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb. L.Rev. 1, 19–25 (1989).[1] Where a physician's diagnostic impression is based on the medical as well as the behavioral aspects of child abuse, the resulting opinion is scrutinized from both perspectives. Myers, *supra* at 24–25, 51. While the admissibility of expert child abuse testimony is subject to attack on several fronts, Morgan raises only one challenge to the admissibility of this evidence. He argues that in both opinions, "there was no scientific basis that the facts or data was of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject."

Because we are bound by the supreme court's ruling in *State v. Schumpert*, 312 S.C. 502, 435 S.E.2d 859 (1993), we hold that the admissibility of the two behavioral science expert opinions at issue was not subject to admissibility challenges based upon reliability. In reaching this result, we point out that the South Carolina Rules of Evidence are inapplicable here, because the July 1995 trial below was held prior to the effective date of the Rules. *See* Rule 1103, SCRE (Rules effective September 3, 1995). Moreover, Morgan's reliance on the federal standard for admitting scientific evidence, *Daubert*

---

1. Hereinafter "Myers." This article was written by an interdisciplinary group of authors, including a social worker, two psychologists, a pediatrician, a child psychiatrist, and an attorney, and it has been cited favorably as a comprehensive overview of the use of experts in child sexual abuse cases. *See, e.g., Gier v. Educational Service Unit No. 16*, 845 F.Supp. 1342, 1344 (D.Neb.1994), *aff'd*, 66 F.3d 940 (8th Cir.1995); *Steward v. State*, 652 N.E.2d 490, 493 (Ind.1995); *State v. Foret*, 628 So.2d 1116, 1124 (La.1993); *Goodson v. State*, 566 So.2d 1142, 1144–45 (Miss.1990); *State v. J.Q.*, 130 N.J. 554, 617 A.2d 1196, 1201 (1993); *State v. Jones*, 71 Wash.App. 798, 863 P.2d 85, 97 (1993), *cert. denied*, 124 Wash.2d 1018, 881 P.2d 254 (1994).

*v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is misplaced, because at least prior to the adoption of the SCRE, *State v. Jones,* 273 S.C. 723, 259 S.E.2d 120 (1979), was the standard for determining the admissibility of novel scientific evidence.[2]

### A.

█ Prior to *Schumpert,* the case law suggests, although somewhat equivocally, that expert behavioral science evidence like that at issue must be found sufficiently reliable before being admitted into evidence. There are two distinct but overlapping lines of cases in this area. First, when expert behavioral science testimony was offered in sexual assault cases, reliability could impact admissibility, depending on the purpose for which the evidence was being introduced. Second, where any expert (not just behavioral science) opinion is based upon scientific methods and techniques, reliability could impact admissibility, depending on the novelty and general acceptance of the expert's underlying methods.

### 1. *State v. Hudnall,* 293 S.C. 97, 359 S.E.2d 59 (1987)

The admissibility of a particular piece of evidence often turns on the purpose for which it is offered, and expert opinion testimony in child abuse cases is no different. Before *Schumpert,* behavioral science evidence concerning syndromes and behavioral characteristics of sexual abuse victims was not

---

**2.** While many of *Jones'*s progeny borrow principles from *Daubert'*s predecessor, *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923), our courts never adopted the *Frye* standard completely in favor of *Jones'*s more liberal approach. *See State v. Ford,* 301 S.C. 485, 488, 392 S.E.2d 781, 783 (1990) ("South Carolina, however, has never specifically adopted the *Frye* test and has employed a less restrictive standard in regard to the admissibility of scientific evidence."). Moreover, the existence of Rule 24(a), SCRCrimP, and Rule 43(m)(1), SCRCP, since 1990 does not yield a different result, because the case law under these two rules did not deviate from *Jones* and because *Daubert* was defined, not solely by Fed.R.Evid. 702, but also by the breadth of the entire Federal Rules of Evidence themselves. *See generally Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *State v. Register,* 323 S.C. 471, 476 S.E.2d 153 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 988, 136 L.Ed.2d 870 (1997); *State v. Dinkins,* 319 S.C. 415, 462 S.E.2d 59 (1995).

permitted as substantive proof of the underlying crime itself or to bolster a "child's testimony that the crime had in fact occurred." *State v. Hudnall,* 293 S.C. 97, 100, 359 S.E.2d 59, 62 (1987). Instead, this type of testimony could only be offered to rehabilitate and "explain any seemingly inconsistent responses to the trauma." *Id.* at 100, 359 S.E.2d at 62.

Although the court did not articulate its rationale in full, *Hudnall* had two distinct bases. First, *Hudnall* was grounded on the well-established character evidence rule which prevents the admission of bolstering evidence, because a witness is presumed to be credible and have good character in the absence of an attack. *See S.C. Dep't of Highways & Pub. Transp. v. ESI Invs.,* 322 S.C. 147, 470 S.E.2d 387 (Ct.App. 1996), *cert. granted,* (1997); E. Warren Moise, *Impeachment Evidence: Attacking and Supporting the Credibility of Witnesses in South Carolina* 69 (1996); *Hudnall,* 293 S.C. at 100, 359 S.E.2d at 62; *see also State v. Rogers,* 293 S.C. 505, 506, 362 S.E.2d 7, 8 (1987) (*Hudnall* rule holds that evidence "of behavioral traits of a sexual abuse child victim ... is not admissible where it serves only to bolster the child's testimony that the crime occurred."). Second, *Hudnall* held that evidence of the victim's post-incident behavior was irrelevant when offered as substantive proof of the crime, because syndromes, behavioral checklists, and other techniques were developed to identify and treat emotional problems, not to determine whether a person was actually sexually assaulted in the past. *Hudnall,* 293 S.C. at 100, 359 S.E.2d at 61; *see also State v. Bradley,* 293 S.C. 526, 527, 362 S.E.2d 19, 20 (1987) (Expert's testimony "regarding common indicators of child sexual abuse including role-playing and sexually explicit behavior ... is inadmissible as proof of the offense."). Finally, *Hudnall* considered the reliability of the expert's methods from both of these two perspectives, holding that the behavioral sciences had not yet developed sufficiently reliable methods to determine whether a victim is telling the truth, *see, e.g., State v. Rimmasch,* 775 P.2d 388, 406 (Utah 1989) ("[N]othing has come to our attention suggesting a general acceptance of the proposition that those who regularly treat symptoms of sexual abuse are capable of determining with a high degree of reliability the truthfulness of allegations that one has been abused."), or whether a particular event (sexual assault) had in

fact occurred in the past. *Hudnall*'s limitation is in accordance with the approach several other jurisdictions have taken when behavioral science evidence is offered for either bolstering or substantive purposes.[3]

However, in *Schumpert* the supreme court overruled *Hudnall*, *Bradley*, and *Rogers* and held that a victim's behavior (and also an expert's interpretation of that behavior) makes it more or less probable that some event occurred in the past. *See Schumpert*, 312 S.C. at 506, 435 S.E.2d at 861 (Expert testimony and behavioral evidence "makes it more or less probable that the offense occurred."). *Schumpert* held this type of evidence to be relevant but still subject to challenges that its probative value is outweighed by its prejudicial effect. At a minimum therefore, *Schumpert* holds that evidence of the victim's post-incident behavior may be relevant when offered for the purpose of substantive proof of the crime itself.

The *Schumpert* court never expressly addressed the two other central concerns of *Hudnall*, however. Although *Schumpert* briefly mentioned *Hudnall*'s limitation to rebuttal purposes, the *Schumpert* court never truly confronted the bolstering issue, but apparently equated character evidence with substantive evidence of sexual abuse. Moreover, *Schumpert* was silent as to another crucial aspect of *Hudnall*: whether behavioral science could reliably ascertain whether a victim was telling the truth or whether some event did in fact occur in the past. While we are reluctant to read *Schum-*

---

**3.** Unlike in *Schumpert*, many courts have turned a jaundiced eye toward the reliability of techniques that behavioral scientists use to ascertain whether sexual abuse has in fact occurred in the past, including: (1) vague symptomology, *State v. Cressey*, 137 N.H. 402, 628 A.2d 696 (1993); (2) behavioral checklists, *Gier*, 845 F.Supp. at 1348 (An expert opinion is essentially irrefutable when based upon a constellation of factors, rather than one symptom or indicator, because the cross-examiner cannot discredit the expert's opinion); (3) Post-traumatic Stress Disorder (PTSD) and Rape Trauma Syndrome (RTS), *Spencer v. General Electric Co.*, 688 F.Supp. 1072 (E.D.Va.1988); *State v. Ballard*, 855 S.W.2d 557 (Tenn.1993); (4) child molestation syndrome, *In re Sara M.*, 194 Cal.App.3d 585, 239 Cal.Rptr. 605 (1987); and (5) general characteristics of sexually abused children as a class, *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830, 836 (1992) ("Permitting an expert to testify about an unsupportable behavioral profile and then introducing testimony to show that the witness acted in conformance with such a profile is an erroneous method of obtaining a conviction.").

*pert* 's silence on these two linchpins of *Hudnall* too broadly, it is difficult to avoid the conclusion that the court implicitly overruled these two aspects of *Hudnall* as well as the relevancy aspect. Accordingly, Morgan's arguments that the opinions were admitted as improper bolstering evidence and were not sufficiently reliable cannot stand in light of *Schumpert.*

 2. *State v. Jones,* 273 S.C. 723, 259 S.E.2d 120 (1979)

 ■ Whatever reliance Morgan places on *Jones* is also unavailing. *Jones* is frequently cited as the leading case for the admissibility of scientific evidence, and its applicability turns on "the degree to which the trier of fact must accept, on faith, scientific hypotheses not capable of proof or disproof in court and not even generally accepted outside the courtroom." *Jones,* 273 S.C. at 731, 259 S.E.2d at 124 (quoting *People v. Marx,* 54 Cal.App.3d 100, 126 Cal.Rptr. 350, 355–56 (1975)). In *Jones* the supreme court held that the admissibility of scientific bite-mark evidence depends on whether the experts relied on scientifically and professionally established techniques. The purpose of this standard is to prevent the "fact finders from being misled by the 'aura of infallibility' that may surround unproven scientific methods." *In re Amber B.,* 191 Cal.App.3d 682, 236 Cal.Rptr. 623, 629 (1987). Unlike *Hudnall* 's concerns, which were specific to only one narrow category of experts, the *Jones* inquiry focuses more on the methods and techniques the expert relies upon, rather than the purpose for which the expert opinion is offered. In fact, *Jones* has been frequently cited in permitting experts to offer substantive proof of the underlying offense. *See, e.g., State v. Ford,* 301 S.C. 485, 392 S.E.2d 781 (1990) (DNA print testing and the process of RFLP analysis were admissible to prove that DNA in sperm found on victim matched DNA found in blood sample of defendant); *cf. State v. Wright,* 322 S.C. 253, 471 S.E.2d 700 (1996) (although *Jones* was not cited, the court held that polygraph results are inadmissible because of their questionable reliability).

 In *State v. Whaley,* 305 S.C. 138, 406 S.E.2d 369 (1991), the supreme court made clear that not all expert testimony is subject to a *Jones* challenge. The *Whaley* court held that *Jones* was not applicable to the testimony of a psychologist who was an expert in eyewitness identification, because where

"the witness is a qualified psychologist who simply explains how certain every day experience shown by the record can affect human perception and memory, and through them, the accuracy of eyewitness identification, we see no reason to require a greater foundation." *Id.* at 142, 406 S.E.2d at 371–72. Although finding *Jones* inapplicable, *Whaley* imposed some limitations on an eyewitness's opinion: "nothing in this opinion should be construed as allowing an expert to give his or her opinion of a particular witness'[s] identification." *Id.* at 143, 406 S.E.2d at 372.

*Jones* and *Whaley* demonstrate that a trial court's threshold inquiry is whether the expert's methods and techniques even fall within *Jones*'s central purpose: to prevent the aura of infallibility which surrounds "scientific hypotheses not capable of proof or disproof in court and not even generally accepted outside the courtroom" from misleading the fact finders. *Jones,* 273 S.C. at 731, 259 S.E.2d at 124. If the expert's opinion does not fall within *Jones,* questions about the reliability of an expert's methods go only to the weight, but not admissibility, of the testimony. However, if *Jones*'s concerns are implicated, then the trial court must make a preliminary ruling on reliability before allowing the testimony to be admitted into evidence.[4]

In light of *Schumpert,* we need not analyze the methods these two experts used. *Schumpert*'s overruling of *Hudnall,* which was grounded in part on reliability (albeit for differing reasons than *Jones*), impliedly dispenses with any *Jones*-type admissibility concerns based upon reliability. Accordingly, the *Jones* analysis is not applicable to the type of behavioral science testimony at issue.[5]

---

4. When *Jones* is applicable, reliability and general acceptance may be established by judicial notice, reliance on prior precedent, and evidentiary hearings. *See generally State v. Register,* 323 S.C. 471, 476 S.E.2d 153 (1996); *State v. Squires,* 311 S.C. 11, 426 S.E.2d 738 (1992); *State v. China,* 312 S.C. 335, 440 S.E.2d 382 (Ct.App.1993).

5. Three other jurisdictions which expressly considered whether a *Jones* analogue applies to expert behavioral science evidence have drawn the line at "pure personal opinion" testimony. In California, a *Jones* analogue is not applied when the testimony is a personal opinion based upon the expert's own experience, skills, and training, rather than a new method of proof, such as an opinion based upon a psychological

## B.

Because *Schumpert* applies to behavioral science evidence only, to the extent that Dr. Porter gave a medical opinion, her testimony must be analyzed from an additional perspective. *See* Myers, *supra* at 24–25, 51. In *State v. Lopez*, 306 S.C. 362, 412 S.E.2d 390 (1991), a pre-*Schumpert* case, the supreme court held that, unlike behavioral science methods which are generally held "not sufficiently reliable as scientific evidence to justify their use to prove a crime occurred," *id.* at 367, 412 S.E.2d at 393, medical evidence may be sufficiently reliable scientific evidence such that it may be used to "support an inference that a child's injuries were not sustained by accidental means." *Id.* Such testimony is typically based on a physician's clinical diagnostic examination and the child's medical history. The medical witness is often called to describe the results of the examination, offer an opinion as to the cause of any injuries, establish whether penetration occurred, and answer questions as to whether the injuries could have been inflicted in a particular way or whether the caretaker's explanation is reasonable. *State v. J.Q.*, 130 N.J. 554, 617 A.2d 1196, 1201 (1993) (citing Myers, *supra* at 48–49).

 Although there may be limitations to this type of testimony,[6] and even if there was error in its admission here,

---

profile or syndrome. *Seering v. California Dep't of Social Servs.*, 194 Cal.App.3d 298, 239 Cal.Rptr. 422, 432 (1987) (citing *Kelly–Frye*, California standard for admission of new scientific evidence established by *People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976), and *Frye*); *see also In re Amber B.*, 191 Cal.App.3d 682, 236 Cal.Rptr. 623 (1987). Florida adopted this approach in *Flanagan v. State*, 625 So.2d 827, 828 (Fla.1993), and Washington appears to follow the same general approach. *See State v. Jones*, 71 Wash.App. 798, 863 P.2d 85, 95–98 (1993), *cert. denied*, 124 Wash.2d 1018, 881 P.2d 254 (1994).

6. At least in certain instances, experts may be required to state that their conclusions are based upon a reasonable degree of medical or clinical certainty. *See Payton v. Kearse*, 319 S.C. 188, 460 S.E.2d 220 (Ct.App.1995), *cert. granted*, (1996); Myers, *supra* at 34. Moreover, a perpetrator's identity is rarely a factor that a physician relies upon in diagnosing or treating a victim. *State v. Hudnall*, 293 S.C. 97, 359 S.E.2d 59 (1987); *State v. Brown*, 286 S.C. 445, 334 S.E.2d 816 (1985). Expert medical opinions based solely on a patient's subjective history may also be suspect. *See generally United States v. Whitted*, 11 F.3d 782, 786 (8th Cir.1993); *United States v. Azure*, 801 F.2d 336, 341 (8th Cir.1986). Although for differing reasons, some courts limit the form of

we find no prejudice in light of the other expert testimony presented. *See generally State v. Brown,* 286 S.C. 445, 334 S.E.2d 816 (1985) (despite improper admission of doctor's testimony which related full history as given by the child, error was harmless in light of other testimony presented at trial); *Honea v. Prior,* 295 S.C. 526, 369 S.E.2d 846 (Ct.App. 1988) (any error caused by the court's admission of one expert's opinion on PTSD was harmless in light of a second expert's testimony concerning victim's PTSD).

## III.

■ In many jurisdictions questions regarding the reliability of a behavioral scientist's opinion may arise in different contexts of the admissibility question, depending on whether the issue is substantive proof of the crime itself, or character evidence, or the methods and techniques that the expert utilizes. In *Schumpert* our supreme court impliedly relaxed some of these threshold reliability concerns. However, *Schumpert* expressly leaves open expert behavioral science testimony to challenges that its probative value is outweighed by its prejudicial effect. *See Schumpert,* 312 S.C. at 506, 435 S.E.2d at 862; *see also State v. Milbradt,* 305 Or. 621, 756 P.2d 620, 624 (1988) ("We have said before, and we will say it again, this time with emphasis—*no psychotherapist may render an opinion on whether a witness is credible in any trial in this state.* The assessment of credibility is for the trier of fact and not for psychotherapists."); *Foret,* 628 So.2d at 1129 (Prejudice can result from an expert's testimony about the victim's credibility, by giving factfinders "little more than a false sense of security based on the incorrect assumption that a reasonably accurate scientific explanation" for behavior has been provided.) (citations omitted).

Here, however, Morgan has not raised an unfair prejudice argument on appeal. Accordingly, because Morgan's challenges cannot stand in light of *Schumpert,* we agree with the State. There was evidence to support the trial court's qualifi-

---

this type of testimony and prefer "consistent with" or "not inconsistent with" language rather than an outright conclusion of sexual abuse. *E.g., Whitted,* 11 F.3d at 785; *cf. State v. Moran,* 151 Ariz. 378, 728 P.2d 248 (1986); *People v. Bowker,* 203 Cal.App.3d 385, 249 Cal.Rptr. 886 (1988); *State v. Cressey,* 137 N.H. 402, 628 A.2d 696, 699–700 (1993).

cation rulings; thus, the court did not abuse its discretion in qualifying the two experts. *Honea v. Prior,* 295 S.C. 526, 369 S.E.2d 846 (Ct.App.1988) (trial court's rulings on qualifications of expert witnesses are reviewed under abuse of discretion standard).

Therefore, for the foregoing reasons, Morgan's conviction is hereby

**AFFIRMED.**

HUFF and HOWARD, JJ., concur.