691 S.E.2d 165

**The STATE, Respondent,**

v.

**Jarod Wayne TAPP, Appellant.**

No. 4529.

Court of Appeals of South Carolina.

Heard Jan. 6, 2009.

Decided April 9, 2009.

Reheard Sept. 1, 2009.

Withdrawn, Substituted and Refiled Feb. 18, 2010.

Rehearing Denied April 22, 2010.

Timothy Clay Kulp, of Charleston, for Appellant.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

THOMAS, J.

Jarod W. Tapp appeals his convictions for murder, criminal sexual conduct in the first degree, and first degree burglary. Tapp alleges the trial court erred in: (1) allowing the introduction of DNA evidence, (2) allowing expert testimony of a crime scene analyst and victimologist, (3) failing to grant a mistrial based on undisclosed exculpatory evidence, and (4) failing to grant a directed verdict at the close of the State's case. We reverse and remand in light of our supreme court's recent decision in *State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009).

## FACTS

On Friday, May 16, 2003, Julie Jett (hereinafter Jett or Victim) failed to appear for work. Concerned, Jett's parents contacted Mrs. Mumpower, the property manager at Jett's apartment complex, and requested she check on Jett. Mumpower knocked several times at Jett's door and then, using a key,[1] opened the door slightly. She saw a great deal of blood on the living room floor and immediately closed the door and contacted police.

Investigators arrived at the scene around 5:30 p.m. and initially noticed a large blood stain near the television, some spatter in different places in the living room, and blood trailing off toward the hallway. Police then discovered Jett's nude body in the hallway bathroom, kneeling on the floor, doubled over the rim of the tub. She had noticeable stab wounds about the face and neck, as well as abrasions akin to carpet burns on her knees and face. Police collected trace evidence and lifted several latent prints from various locations

---

1. Mrs. Mumpower made no attempt to open the door without the key and therefore could not determine whether the door was locked or unlocked when she arrived.

throughout the apartment but found none in the bathroom. Further examination of the doors and windows showed no indication of forced entry.

An autopsy determined Jett's death to be a homicide, occasioned by two perforations to the jugular vein, causing excessive blood loss. The autopsy revealed "battle signs" including a broken nose and jaw,[2] a black eye, and bruises to both ears. The coroner also conducted a "rape kit," and swabs of Victim's vaginal and rectal cavities yielded the protein p30, indicating the presence of semen, although no sperm cells were recovered.

Authorities conducted DNA testing on the swabs; however, this testing produced only a "mixture" or "partial profile" of Jett and another individual.[3] Due to the mixed nature of the profile and the ability of female DNA, in such situations, to mask the presence of male DNA, only a minimum number of loci could be matched. While these matches did not rule out Tapp, the statistical probability of a randomly selected and unrelated individual being the source of the evidence was only one in twenty-three.

In order to conduct a more thorough DNA analysis, samples were sent to ReliaGene laboratories in New Orleans, Louisiana, for Y–STR testing, which has the capability of producing a more accurate DNA profile when there is a mixture of male and female DNA present in the sample. The test compared the "male extract" from the vaginal swab against the Y–STR profile, which extracts only those loci along the Y chromosome unique to men. Tapp's standard sample matched the "male extract" from the vaginal swab on all 10 loci that the Y–STR test examines. This test could not exclude Tapp, and at the time of trial, the statistical probability of a randomly selected

---

2. Jett's jaw was broken in two places.

3. Although the swabs revealed the presence of semen, the test for semen looks for a particular protein called p30. According to the State's expert: "[the test] is sensitive for the presence of p30 at extremely low levels. [However, t]he amount of DNA necessary to develop a DNA profile is greater than the minimum threshold amount of p30 that's needed for [the] test to be positive. So it is not uncommon for a positive p30 semen presence test [to] yield no DNA profile other than the individual source, in this case, the victim."

and unrelated individual being the source of the DNA was one in 17,800 among white males.

## PROCEDURAL BACKGROUND

Tapp filed a motion *in limine* with the trial court to suppress the DNA evidence because the State did not demonstrate that it was going to offer evidence that the DNA sample was deposited in Victim during the time frame between when she was last seen alive and when her body was discovered. Tapp also argued, *in limine*, to introduce a second statement he made to the police, in which he admitted to having had previous sexual encounters with Jett. The trial court allowed the DNA testimony but did not allow the statement. However, it left open the opportunity for Tapp to testify about his prior sexual relationship with Jett.

Among its various expert witnesses, the State qualified Michael Prodan, a special agent with the State Law Enforcement Division (SLED), over Tapp's objection, as an expert in crime scene analysis and victimology. Prodan, through a review of crime scene photos, autopsy reports, and other information provided by the police and prosecution, developed an opinion as to Victim's particular risk level and gave an opinion as to the possible ways in which the altercation between Victim and the perpetrator transpired.

Some time during the investigation, the State discovered Ryan Wheatley, Jett's roommate's boyfriend, may have had a key to the apartment. The State's witnesses, Solveig Heintz, and Prodan both testified that Ryan may have had a key. Tapp alleges the State withheld this information, and after Prodan testified to it, he unsuccessfully moved for a mistrial.

At the close of the State's case, the trial court denied Tapp's motion for a directed verdict. Tapp offered no evidence in his defense, and the jury convicted him on all charges. This appeal followed.

## ISSUES ON APPEAL

I. Did the fact that the State did not provide evidence to demonstrate the DNA sample was deposited in Victim sometime between the time she was last seen alive

and when her body was discovered render the evidence irrelevant?

II. Did the trial court err in qualifying Prodan as an expert witness and allowing his testimony?

III. Did the trial court err in denying Tapp's motion for a mistrial because the State allegedly withheld exculpatory evidence?

IV. Did the trial court err in failing to grant a directed verdict at the close of the State's case?

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006).

## LAW/ANALYSIS

Because we find it dispositive of the matter at hand, we address only Tapp's allegation of error as to the qualification of Prodan as an expert witness.

### Qualification of an Expert Witness

Tapp first alleges that it was error to qualify Prodan as an expert witness. We agree.

When this court first heard this case we reversed the trial court and remanded the matter for a new trial. Subsequently, we granted the State's petition for rehearing to reevaluate our apprehension of the rules of issue preservation. However, in the interim the South Carolina Supreme Court addressed the issue of the qualification of non-scientific expert witnesses in *State v. White,* 382 S.C. 265, 676 S.E.2d 684 (2009). In our original opinion, we affirmed the qualification of Prodan, relying on very specific language from *State v. Morgan,* which stated in the context of nonscientific expert testimony, issues of reliability go to the weight of the evidence, rather than its admissibility. 326 S.C. 503, 513, 485 S.E.2d 112, 118 (Ct.App. 1997). However, in *State v. White,* the South Carolina Supreme Court overruled *Morgan* and declared this specific proposition an "incorrect statement of law." *White,* 382 S.C. at 273, 676 S.E.2d at 688. Accordingly, on rehearing, we find

*White* necessitates we revisit the issue of Prodan's qualification as an expert.[4]

In *White*, the appellant was convicted of armed robbery and kidnapping. *State v. White*, 372 S.C. 364, 375, 642 S.E.2d 607, 612 (Ct.App.2007). White appealed, arguing expert dog tracking evidence must satisfy the standard for "scientific based" expert testimony under the *State v. Jones*[5] reliability test. *Id.* at 375, 642 S.E.2d at 612. This court affirmed White's convictions, noting a distinction between scientific testimony and nonscientific, or experience based, expert testimony, and held questions about the reliability of the evidence in nonscientific areas of expertise go only to the weight to be given the testimony and not its admissibility. *Id.* Our decision in *White* relied on *Morgan* for the proposition that " '[i]f the expert's opinion does not fall within [the] *Jones* [standard for scientific expert testimony], questions about the reliability of an expert's methods go only to the weight, but not admissibility, of the testimony.' " *Id.* at 376, 642 S.E.2d at 613 (citing *Morgan*, 326 S.C. at 513, 485 S.E.2d at 118).

On appeal, the supreme court, although affirming White's convictions on other grounds, rejected the rationale and analytical framework of the court of appeals. The supreme court emphatically declared the *Morgan* rule to be an incorrect statement of the law. *White*, 382 S.C. at 273–74, 676 S.E.2d at 688. The *White* court explicitly overruled *Morgan* "to the extent it suggests that only scientific expert testimony must pass a threshold reliability determination by the trial court prior to its admission into evidence." *Id.* at 273, 676 S.E.2d at 688.

█ The foundation of the *White* decision is that *all* expert testimony must satisfy Rule 702, SCRE, including the trial court's gatekeeping function of ensuring the proposed expert testimony meets a threshold level of reliability, regardless of whether it is scientific or nonscientific. *Id. White* holds that in discharging this gatekeeping role, "a trial court must assess

4. Initially, we note both parties concede this matter is governed by the South Carolina Supreme Court's recent decision in *State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009), issued while this appeal was pending before this court.

5. *State v. Jones*, 273 S.C. 723, 732, 259 S.E.2d 120, 124–25 (1979).

the threshold foundational requirements of qualification and reliability and further find that the proposed evidence will assist the trier of fact[, and] ... only after the court has vetted the matters of qualifications and reliability and admitted the evidence" may challenges be dismissed as going to the weight rather than admissibility. *Id.* at 274, 676 S.E.2d at 688. The *White* court stated the tenant of evidence law in which a challenge goes to the weight and not the admissibility of the evidence "has never been intended to supplant the gatekeeping role of the trial court in the first instance in assessing the admissibility of expert testimony, including the threshold determination of reliability." *Id.* at 273, 676 S.E.2d at 688. Both scientific and nonscientific expert testimony is subject to Rule 702, "both in terms of expert qualifications and reliability of the subject matter." *Id.* Thus, the trial court must make an initial finding that the nonscientific expert's methods meet a threshold level of reliability. *See id.* at 272–73, 676 S.E.2d at 688 (stating the *Morgan* rule that "[i]f the expert's opinion does not fall within [the] *Jones* [standard for scientific expert testimony], questions about the reliability of an expert's methods go only to the weight, but not admissibility, of the testimony" is an incorrect statement law).

Although the *White* court held the foundational reliability of nonscientific testimony must be tested prior to the qualification of an expert, it further stated that such a requirement does not lend itself to a "one-size-fits-all approach." *Id.* at 274, 676 S.E.2d at 688. Rather, the court only created a six part test for the reliability of expert canine tracking evidence,[6] and made no attempt to derive a formulaic approach for all nonscientific experts, as it could "not pretend to know the myriad of Rule 702 qualification and reliability challenges that could arise with respect to nonscientific expert evidence." *Id.* Consequently, this court is left with no guidance on what test or elements must be satisfied to establish the foundational

---

6. The supreme court's six part test for the reliability of expert dog tracking evidence requires: (1) the evidence shows that the dog handler has the requisite qualifications of an expert under Rule 702; (2) the dog is of a breed characterized by an acute power of scent; (3) the dog has been trained to follow a scent trail; (4) by experience the dog is found to be reliable; (5) the dog was placed on the trail where the suspect was known to be within a reasonable time; and (6) the trail was not otherwise contaminated. *White,* 382 S.C. at 272, 676 S.E.2d at 687.

reliability necessary to qualify an expert in the fields of crime scene analysis and victimology.

■ As an initial matter, the parties agree that crime scene analysis and victimology are nonscientific areas of expertise. Further, the parties also concede the trial court's ruling that Tapp's challenges went only to the weight of the evidence rested on the very same rationale that the supreme court specifically overruled in *White*. Therefore, although proper at the time it was made, the ruling does not comport with *White*'s requirement that the trial court first make a threshold determination of reliability before dismissing such attacks as going only to the weight of the evidence rather than its admissibility. Accordingly, the only issue remaining is whether the record in this matter is sufficient for this court to determine, on its own, if the requirements of the *White* decision could have been met.

■ The State argues the record in this case is sufficient for this court to determine whether Prodan should have been qualified under *White*. We disagree.

In support of its position, the State highlights: (1) Prodan's credentials, education and experience, (2) his ability to rule out various scenarios of how or why the crime transpired, and (3) the process's relative success as an investigative tool to law enforcement. While these arguments are relevant, we find they go to the other *White* elements, (i.e., the expert's credentials, education, or experience and the ability of the expert to assist the trier of fact) rather than the element of reliability. *See id.* at 274, 676 S.E.2d at 689 (indicating that under Rule 702 the State must establish: (1) the expert has the requisite qualifications, experience, and/or credentials; (2) the methodology by which the evidence is obtained is reliable; and (3) the evidence will assist the trier of fact). Moreover, we are not convinced that the process's relative success as an "investigative tool" renders it *per se* reliable in the context of qualifying an expert. *See, e.g., Lorenzen v. State,* 376 S.C. 521, 533, 657 S.E.2d 771, 778 (2008) (stating that the South Carolina Supreme Court " 'has consistently held the results of polygraph examinations are generally not admissible because the reliability of the tests is questionable.' " (quoting *State v. Council,* 335 S.C. 1, 23, 515 S.E.2d 508, 519 (1999))).

Further, although the State initially indicated the *Council* factors for the reliability of scientific testimony [7] are wholly irrelevant in the context of nonscientific experts, it nonetheless proposes this court could find *White* is satisfied based on (1) the inherent reliability of the photos and reports Prodan used to derive his opinion, because such information is of the type other experts in the field rely upon; and (2) the fact that some of Prodan's cases have been peer reviewed. We disagree.

We do not agree with the State's position that the *Council* factors are wholly irrelevant. As the State's discrepant argument implies, some of the Council factors may be quite relevant. The fact that some of Prodan's cases have been peer reviewed could be significant. However, the record indicates that only *some* cases have been peer reviewed. The record does not indicate that this particular case was subject to peer review, nor does it demonstrate Prodan's rate of success or accuracy in predicting what actually occurred at a crime scene. Furthermore, much of the State's position neglects that of manifest concern to the trial court's threshold determination is not only the reliability of the information Prodan used, but also the reliability of the process by which that information is synthesized and analyzed in order to develop a final opinion. For instance, in *White*, the inquiry did not focus solely on the reliability of the expert dog handler, but also on the reliability of his method of tracking: that is, the use of a particular dog and how that dog's skills were employed under the given circumstances. Similarly, the inquiry in this case cannot focus solely upon how reliable Prodan himself is, but must assess the reliability of the process by which he derives his opinion, whatever that process may be.

Accordingly, without the guidance of the *White* decision, Tapp was not able to sufficiently develop and pursue theories

---

7. When evaluating expert scientific testimony under the *Jones* standard, several factors are considered: "(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures." *State v. Council,* 335 S.C. 1, 20, 515 S.E.2d 508, 517 (1999); *State v. Ford,* 301 S.C. 485, 488, 392 S.E.2d 781, 783 (1990).

upon which to challenge Prodan's qualification; nor was the trial court given the opportunity to address the issue. We find that given the deficient nature of he record on this issue it would be imprudent of this court to attempt to fashion a test or rule for the qualification of a crime scene analyst or victimologist. Rather, justice demands this burden first be placed upon the trial court after allowing the parties to fully develop the issue.

In light of our decision on this issue, we need not address Tapp's allegation that Prodan's testimony was improperly admitted, or the remaining issues on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating that an appellate court need not address remaining issues when a decision on a prior issue is dispositive); *Whiteside v. Cherokee County Sch. Dist. No. One,* 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) (need not address all issues when decision on a prior issue is dispositive).

## CONCLUSION

The trial court could not have evaluated the qualification of Prodan in light of *State v. White,* and the record is insufficient for this court to do the same. Accordingly the ruling of the trial court is

**REVERSED and REMANDED for a new trial.**

HUFF, and LOCKEMY, JJ., concur.