728 S.E.2d 468

**The STATE, Petitioner,**

**v.**

**Jarod Wayne TAPP, Respondent.**

**No. 27129.**

Supreme Court of South Carolina.

Heard Nov. 29, 2011.

Decided June 6, 2012.

Rehearing Denied July 27, 2012.

378

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter III, all of Columbia, and Scarlett Anne Wilson, of Charleston, for Petitioner.

Timothy C. Kulp, of Charleston, for Respondent.

Chief Justice TOAL.

We granted the State's request for certiorari to review the court of appeals' decision in *State v. Tapp*, 387 S.C. 159, 691 S.E.2d 165 (Ct.App.2010), which reversed and remanded Respondent's convictions and sentences for a new trial. The court of appeals found that the record in this case was insufficient for determining whether the circuit judge properly considered the reliability of Special Agent Prodan's testimony prior to introducing that testimony to the jury, as required by *State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009). We agree that our decision in *White*, decided while Respondent's appeal was pending, governs this case, but take this opportunity to clarify *White* in light of the court of appeals' misreading of *White* in the opinion below. Our reading of the record convinces us the circuit judge stopped short of determining the reliability of Prodan's testimony prior to admitting it into evidence, and therefore the trial court erred. However, we find that the error in admitting the testimony at issue was harmless. Accordingly, we reverse the court of appeals and reinstate Respondent's convictions.

## FACTS

Jarod Wayne Tapp (Respondent) was convicted of murdering and sexually assaulting his upstairs neighbor, Julie Jett (victim), and of burglarizing her apartment. Respondent received a life sentence for murder and two thirty-year sentences for the first degree criminal sexual conduct and burglary charges.

Victim was a resident of the apartment located above the apartment Respondent shared with his grandmother. Victim was in the process of packing her apartment on the Thursday evening when she was last seen alive. She planned to move in with a friend in Mount Pleasant the following Saturday. Victim and that friend moved several of her belongings to the Mount Pleasant apartment on Thursday evening, and the victim left the friend's apartment shortly after 10:00 p.m. with plans to return to her own apartment.[1] When the victim did not show up for work the next morning, her coworkers became concerned. They were unable to reach her, and eventually they contacted her father, who convinced the apartment manager to check the victim's apartment. At approximately 5 p.m. on Friday, May 16, 2003, an apartment employee knocked on the victim's door several times, and after hearing no response, used the office's copy of the key to open the door to the victim's apartment.[2] Upon cracking the door open, the employee observed a large amount of blood on the carpet in the living room area. She immediately closed the door and called the police.

The police arrived at approximately 5:30 p.m. and noticed a copious amount of blood on the carpet in the living room area near the television and several areas of blood splatter in the vicinity. Lying on the blood-stained carpet was a broken piece of black plastic that investigators later determined was a broken part of a knife handle. This plastic was an exact match to the knife set the victim owned that was sitting on her

---

1. A detective testified the drive from the friend's apartment to the victim's apartment, located west of the Ashley River in Charleston, took approximately seventeen minutes, presumably placing the victim back at her apartment at approximately 10:30 p.m.

2. The employee made no attempt to open the door without the key and therefore could not determine whether the door was locked or unlocked when she arrived.

kitchen counter.[3]  Investigators discovered the victim's nude body in the apartment's hall bathroom, her knees on the floor and her body draped face-first over the edge of the tub, with her buttocks in the air.  There was no blood on the carpet of the hallway that led to the bathroom where she was found, although there were several swipes of blood on the hallway walls.  Investigators lifted several latent prints from the apartment that matched the victim, but were unable to retrieve any prints from the bathroom.  An examination of the doors and windows in the apartment showed no indication of forced entry.

Victim had approximately 20 stab wounds about the face and neck and died from blood loss and blunt force trauma to the head.[4]  She had deep carpet-burn type injuries on the knees and face.  A rape kit examination revealed the presence of a protein indicating semen in the victim's vaginal vault and in her rectum.  The sperm within the semen that could produce a DNA profile was either of very low quantity or quality.  A DNA profile for the semen could not be recovered from the rectal swab, although the DNA expert who conducted the testing found the swab did show that a male protein was present in the rectum.  Only a partial DNA profile could be developed from the vaginal swab.  After sending the vaginal swab to another laboratory for more sensitive testing, the statistical probability of a randomly selected and unrelated individual not being excluded as the source was one in 17,800 white males.  Respondent could not be excluded as the source.[5]

The investigation into Respondent's connection to the victim's murder began after he was identified as a neighbor whom the victim and her roommate found "creepy."  The day after the victim's body was discovered, on Saturday, her current roommate called the lead investigator on the case and

---

3.  One knife from the set was unaccounted for.  Investigators never found the missing knife.

4.  Victim's nose and jaw were broken, she had a black eye, and bruising on both ears.

5.  Stated differently, if there was a group of 17,800 white males, 17,799 of them could be excluded as being the source of the DNA. Respondent could not be excluded.

informed her of an interaction she and the victim had with Respondent that gave her pause.[6]   After hearing this, on that same day, the investigator attempted to contact Respondent at his grandmother's apartment, but was informed he was now living with his mother on the Isle of Palms.   The investigator was able to make contact with Respondent's mother and arranged for him to come to the station for questioning.[7]

During this initial interview, Respondent recounted the following facts.   On the Thursday evening when the victim was last seen alive, Respondent's grandmother picked him up from a grocery store and they returned to their apartment between 8:30 and 9:00 p.m. Shortly after returning to the apartment, Respondent went to the apartment complex pool and, not finding anyone there, walked to a nearby convenience store to buy a thirty-two ounce bottle of malt liquor.[8]   Respondent stated he returned to the pool, made several phone calls, and encountered two females who undressed and swam with two other males.   He told the investigator that he consumed two 32 ounce malt liquor beverages that evening and did cocaine while at the pool. Respondent stated he stayed at the pool until around midnight when he called his grandmother to open the door for him.   Respondent stated that he had only been to the victim's apartment on two occasions—once when prior residents lived there, and once a few months before the murder to use a phone and the bathroom.[9]   Respondent gave

---

6.   Victim's roommate recounted an occasion one evening when Respondent knocked on their door asking to use their phone because he was locked out of his grandmother's apartment.   When the roommate turned to retrieve her phone, which was on a table just inside the doorway, Respondent walked in uninvited.   The roommate stated he appeared to be high and smelled of alcohol.   Victim was sitting on the couch at the time.   Respondent made a quick phone call and left. According to the roommate, she and the victim thought the interaction was strange.

7.   They originally scheduled a meeting on Monday, but Respondent failed to appear.   Respondent came voluntarily to the station on Tuesday, however.

8.   Video footage obtained from the convenience store verifies Respondent purchased the malt liquor at 9:36 p.m.

9.   Victim's roommate testified that Respondent did not use the bathroom during their brief encounter.   The bathroom Respondent claims he used was same bathroom where the victim was found dead.

fingerprint exemplars and DNA samples after making his written statement.

Cell phone records indicate phone calls being made from Respondent's phone every couple of minutes throughout the evening, but with no phone activity between 10:36 p.m. and 12:11 p.m., when a call was placed to his grandmother. A neighbor testified that while sitting on her porch that Thursday evening, she heard a loud thud coming from the vicinity of the victim's apartment between the hours of 9:30 and 11:00 p.m. that evening, and the light to the victim's apartment was on. The neighbor approached police at the crime scene the next day to inform police of what she heard.

Two witnesses who shared a prison cell with Respondent testified that Respondent claimed he and victim had prior sexual relations. The State presented several witnesses to refute this testimony, including the victim's roommate and her coworker. These witnesses testified that the victim found Respondent "creepy." The coworker recounted a conversation where she asked the victim why she was moving rather than re-signing the lease to her apartment. The coworker testified that the victim stated she would not mind moving to a different apartment within the complex, but that the guy who lived below her "creeped her out," and that "[h]e would say things to her and he bothered her." In that conversation, the coworker testified the victim elaborated on her feelings about Respondent, stating, "[H]e looks like he smells bad."

The prison cellmates of Respondent additionally alleged that Respondent confessed to the murder. The first cellmate stated Respondent told him that he and the victim had a sexual relationship and that Respondent used his key to enter her apartment after a man Respondent was doing cocaine with stated he also had sex with the victim. The witness testified that Respondent stated he "went in to confront the girl about it and he said before he knew it, he had stabbed her over and over and over and over again." After making the above statement, the witness testified Respondent dropped to the floor and begged the other prisoners to keep quiet because his "daddy done spent a lot of money on a lawyer." The second cellmate witness recounted a similar conversation.[10]

---

10. Both cellmates wrote letters to the solicitor offering information about Respondent's confession in exchange for lesser prison sentences.

At trial, the State proffered Special Agent Prodan pretrial for a determination of whether he could be qualified as an expert in crime scene analysis and victimology, and whether his testimony would be admissible. Agent Prodan testified at this in camera hearing to his education, training, and experiences. Prodan explained his area of expertise:

Crime scene analysis is a technique where a combination of forensics, behavior, victimology, crime scene assessment, crime scene reconstruction are put together to make an assessment of a violent crime to determine everything from victims' risks to becoming a victim of a violent crime, motive of the offender, possible characteristics and traits of the offender, interview and investigational strategies for ... crime.

Over Respondent's objection, the circuit judge found Prodan was qualified as an expert. The circuit judge subsequently decided to admit Prodan's proffered testimony. The State offered Prodan as their final witness. Respondent did not call any witnesses.

On appeal to the court of appeals, Respondent argued, among other issues, that the circuit court erred in qualifying Prodan as an expert and in admitting his testimony. The court of appeals initially held that the circuit court did not err in finding Prodan was qualified as an expert, but that Prodan's testimony was irrelevant and unduly prejudicial. Therefore, the court reversed his convictions and remanded the case for retrial. The State filed a petition for rehearing, and while that petition was pending, this Court decided *State v. White*, 382 S.C. 265, 676 S.E.2d 684 (2009). In *White*, we held that, pursuant to Rule 702, SCRE, the reliability of non-scientific expert testimony is also part of the gatekeeping function of a trial court and should be determined prior to its admission into evidence. The court of appeals granted the State's petition for rehearing, and after oral arguments, substituted and refiled its opinion. In *State v. Tapp*, 387 S.C. 159, 691 S.E.2d 165 (Ct.App.2010), the court again reversed Respondent's convictions and remanded after finding that the record in this case was insufficient for determining whether, prior to introducing Prodan's testimony to the jury, the circuit judge

Neither cellmate received a lesser sentence for testifying or giving this information, however.

properly considered its reliability, as required by *White.* This issue being dispositive of the remaining issues, the court of appeals did not reach Respondent's remaining issues. This case is before this Court upon grant of the State's Petition for Writ of Certiorari.

### *Issues*

I. Whether Respondent is procedurally barred from arguing the admission of Prodan's testimony did not comport with *White* because Respondent did not specifically object to the circuit judge's failure to make a reliability finding prior to admitting Prodan's testimony.

II. Whether the court of appeals erred in finding the record was insufficient for determining whether the circuit court assessed the reliability of Prodan's testimony prior to its admission.

III. Whether any error resulting from the admission of Prodan's testimony was harmless beyond a reasonable doubt.

### *STANDARD OF REVIEW*

The admission or exclusion of evidence is an action within the sound discretion of the circuit court and will not be disturbed on appeal absent an abuse of discretion. *State v. Williams,* 386 S.C. 503, 509, 690 S.E.2d 62, 65 (2010). An abuse of discretion occurs when the conclusions of the circuit court are either controlled by an error of law or are based on unsupported factual conclusions. *State v. Douglas,* 369 S.C. 424, 429–30, 632 S.E.2d 845, 848 (2006).

### I.  Preservation

The State argues that the court of appeals erroneously granted relief on an issue that was not preserved for appellate review because, although Respondent objected on the ground that Prodan failed to provide the data he relied on, Respondent did not specifically object to the circuit judge's failure to make findings in accord with *White* when it admitted Prodan's testimony. We disagree. While our preservation rules require that objections to the admissibility of evidence be specific, *see State v. Byers,* 392 S.C. 438, 710 S.E.2d 55

(2011), they most certainly do not require clairvoyance. We find that Respondent's objections to Prodan's testimony were sufficiently timely and specific, and that the judge ruled on those objections accordingly.

After Prodan's voir dire as to his experience and training, Respondent objected to the qualification of Prodan as an expert, arguing:

We think, Your Honor, that specifically that he is not qualified in this instant [sic] to render testimony as an expert witness that would be relevant in the sense that it would even fail under a test of being probative. In effect, and in short, it is simply another person's opinion as opposed to something that would qualify him to give the jury any more ability to render decision in this case as the finer of fact than a lay witness.

The State countered that Prodan was most certainly qualified as an expert in the field based on his in camera testimony and that Respondent's argument about relevance of the testimony went to the weight the jury should accord to Prodan's testimony, not to his qualification as an expert in the field of crime scene analysis or victimology. The circuit judge agreed and found Prodan was qualified as an expert.

Respondent then moved to exclude Prodan's testimony from trial for the following reasons:

(1) Prodan could not comply with Rule 705, SCRE, in that he could not cite any data upon which he relied;

(2) his testimony was marked by qualifiers such as "suggest, if, maybe, assume, could be, might, you would suspect, would not be unreasonable to suggest, it would appear," rendering his expert opinions "mere speculation [that] serves no purpose ... [but is] highly prejudicial" and confusing, "injecting issues into this case for which there is no foundation;" and

(3) the basis for Prodan's opinion was merely his opinion.

The State argued that once Prodan was qualified as an expert, the standards under Rules 702 and 703, SCRE, were "pretty low in the State of South Carolina." Finally, the State contended all of Respondent's arguments went to the weight that should be accorded the evidence, not to its admissibility.

The court declined to rule at that juncture whether Prodan's testimony would be admitted.

As the trial progressed, the State asked the court to rule whether Prodan would be permitted to testify. Respondent renewed his objections, arguing the testimony was pure speculation, that it was prejudicial, and that it was confusing. The State responded, again, "Your Honor, I think all of those arguments go to the weight of his testimony, not the admissibility." The circuit judge then responded, "I'm going to allow it." When the State called Prodan as a witness, Respondent renewed his objection, which the circuit judge stated was noted for the record. After qualifying Prodan before the jury, the judge again noted Respondent's previous objection for the record. Therefore, Respondent objected to Prodan's testimony at every available point during the trial and on every ground available to him at the time. After hearing the extensive arguments of Respondent, the circuit judge overruled these objections. Accordingly, we find the issue of the admissibility of Prodan's testimony is sufficiently preserved.

## II. Circuit Judge's Admission of Prodan's Testimony

The court of appeals found that "without the guidance of the *White* decision, [Respondent] was not able to sufficiently develop and pursue theories upon which to challenge Prodan's qualifications; nor was the trial court given the opportunity to address the issue." *Tapp*, 387 S.C. at 168–69, 691 S.E.2d at 170. Therefore, the court reversed and remanded the case for a new trial so that the parties could fully develop the issue of reliability in light of *White. Id.* at 169, 691 S.E.2d at 170. The State concedes that this Court's ruling in *White* governs the admission of Prodan's testimony, but argues that the record sufficiently demonstrates that the circuit judge vetted Prodan's testimony for its reliability prior to admitting it to the jury. We believe the record supports that the circuit judge admitted Prodan's testimony based merely on a finding he was qualified as an expert, and left the reliability determination for the jury. Therefore, the admission of Prodan's testimony was error.[11]

---

11. We make no conclusions about the reliability of Prodan's testimony.

*White* involved the admissibility of dog tracking evidence. The court of appeals had decided several cases in which it opined that nonscientific expert testimony, such as that of a dog tracker, was not subject to a reliability determination of the trial judge under Rule 702, SCRE. Rather, any reliability questions of such a nonscientific expert went to the weight a jury should accord the testimony, not to its admissibility. *State v. White,* 372 S.C. 364, 642 S.E.2d 607 (Ct.App.2007); *State v. Morgan,* 326 S.C. 503, 485 S.E.2d 112 (Ct.App.1997). This is the authority the circuit court relied upon to admit Prodan's testimony based merely upon a finding that he was qualified as an expert.

In *White,* this Court clarified that all expert testimony, not just scientific expert testimony, must be vetted for its reliability prior to its admission at trial. The Court concluded:

> The familiar evidentiary mantra that a challenge to evidence goes to "weight, not admissibility" may be invoked only after the trial judge has vetted the matters of qualification and reliability and admitted the evidence.

*White,* at 274, 676 S.E.2d at 689.

For the most part, the court of appeals' rendering of *White* was correct. However, the court misstated that *White* created the requirement that "the foundational reliability of nonscientific testimony must be tested *prior* to the qualification of an expert." *Tapp,* 387 S.C. at 166, 691 S.E.2d at 169 (emphasis added). The court additionally stated, "this court is left with no guidance on what test or elements must be satisfied to establish the foundational reliability *necessary to qualify an expert* in the fields of crime scene analysis and victimology." *Id.* at 166–67, 691 S.E.2d at 169. To be clear, the reliability of a witness's testimony is not a pre-requisite to determining whether or not the witness is an expert.[12] The expertise, reliability, and the ability of the testimony to assist the trier of fact are all threshold determinations to be made prior to the admission of expert testimony, and generally, a witness's expert status will be determined *prior* to determining the reliability of the testimony.

---

12. The dog tracker's qualifications under Rule 702, SCRE, were conceded in *White.*

In this case, after qualifying Prodan as an expert, but before admitting his testimony to the jury, Respondent argued that the substance of Prodan's testimony was "entirely personal" and that Prodan should have produced a written report of his findings and the data upon which he relied so that Respondent could verify Prodan's conclusions with other experts in the field. After making this argument, the State countered, "Your Honor, I think all of those arguments go to the weight of his testimony, not the admissibility." The circuit judge then stated, "I'm going to allow it." Under *White*, after qualifying Prodan as an expert, the circuit judge should have then evaluated the substance of Prodan's testimony to determine if it was reliable, as required by Rule 702, SCRE. However, the law at the time of this trial instructed that the reliability of nonscientific expert testimony was a determination to be made by the jury. Accordingly, it appears from the record that the circuit judge admitted Prodan's testimony after making the initial determination of his expertise. Although admitting Prodan's testimony before vetting it for its reliability was error, we find that error to be harmless.

### III. Harmless Error

The key factor for determining whether a trial error constitutes reversible error is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Charping*, 313 S.C. 147, 157, 437 S.E.2d 88, 94 (1993) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *overruled on other grounds by Franklin v. Catoe*, 346 S.C. 563, 552 S.E.2d 718 (2001)). "Whether an error is harmless depends on the circumstances of the particular case." *State v. Mitchell*, 378 S.C. 305, 316, 662 S.E.2d 493, 499 (2008). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it 'could not reasonably have affected the result of the trial.'" *Id.* (quoting *State v. Key*, 256 S.C. 90, 180 S.E.2d 888 (1971)).

Engaging in this harmless error analysis, we note that our jurisprudence requires us not to question whether the State proved its case beyond a reasonable doubt, but whether

beyond a reasonable doubt the trial error did not contribute to the guilty verdict. *See State v. Mizzell,* 349 S.C. 326, 334, 563 S.E.2d 315, 319 (2002) (harmless error jurisprudence requires that the error not contribute to the verdict obtained). In finding Respondent guilty, the jury made a number of factual determinations, including the probability that the DNA found inside the victim belonged to Respondent, the plausibility that the DNA was there by innocent means, and the credibility of the cellmate witness's testimony. Therefore, our analysis focuses on whether Prodan's testimony lent more credence to the DNA results, its manner of deposit, or the validity of the cellmate witness's testimony.

In relevant part, Prodan testified that because there was no sign of struggle at the doorway, there was no sign of forced entry, and the victim habitually locked her door, the assailant may have entered the apartment either because the victim recognized him or because the assailant created a ruse that caused the victim to invite him in. Prodan recognized the possibility that the victim unintentionally left the door unlocked, allowing the assailant to walk in. Additionally, because of the victim's relatively low risk for encountering a violent crime, he believed she was likely targeted for sexual assault. Prodan stated his belief that this was a sexually motivated crime because the victim was found nude with multiple stab wounds and blunt force trauma, and semen was found inside the victim. He opined that because it appears the victim was stabbed with a knife that belonged to her and was sitting on her kitchen counter, the assailant most likely did not come to the apartment for the purpose of killing the victim, although he may have had the intention to sexually assault her. Finally, Prodan noted that the lack of blood in the hallway leading to the bathroom where the victim was found indicated the victim was carried from the struggle scene in the living room to the bathroom, and then intentionally "posed" in a sexually suggestive manner. He opined that the assailant may have posed her this way to demonstrate a feeling of contempt or to degrade the victim.

Beyond a reasonable doubt, we believe that Prodan's testimony could not have contributed to the verdict obtained. Prodan provided lengthy testimony about the opinions he formed after a review of crime scene and autopsy photo-

graphs, crime scene reports, several witness statements, and crime rate statistics for the apartment complex. However, Prodan did not review any information about Respondent's background, nor did he review the statements Respondent made to the police. Prodan did not promote the validity of the DNA results or boost the credibility of the inmates' testimony about Respondent's confession. For these reasons we believe that the error of admitting Prodan's testimony before a determination of its reliability was harmless beyond a reasonable doubt.

## CONCLUSION

We find that the issue of whether Prodan's testimony was properly admitted is preserved for appellate review. On the merits, we find that Prodan's nonscientific testimony was not properly vetted for its reliability before its admission into evidence, as required by our holding in *White.* However, we find the error in admitting Prodan's testimony could not have contributed to Respondent's convictions. As to the remaining issues Respondent raised to the court of appeals, we have reviewed the briefing of those issues and find them to be without merit. Therefore, we reverse the court of appeals and reinstate Respondent's sentences.

**REVERSED.**

BEATTY, KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES.

I respectfully dissent. I agree with the majority that the issue of the admissibility of Agent Prodan's testimony was preserved for appellate review, and that the trial judge erred in admitting Prodan's testimony without determining that the evidence was reliable. I disagree, however, that the admission of that testimony was harmless error.

As I read the majority opinion, it does not view Prodan's testimony in light of the properly admitted evidence in the record to determine whether this erroneously admitted evidence could have contributed to the jury's verdict. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Instead, the majority posits that the jury made three critical factual determinations:

(1) that the DNA evidence established respondent was the source of the protein found in the victim's vaginal vault;

(2) that the DNA was not present as a result of consensual sexual activity between the victim and respondent; and

(3) that the inmates' testimony of respondent's purported confession was credible.

The majority then determines that Prodan's testimony could not have contributed to the verdict obtained. I disagree.

The majority states Prodan's testimony did not "promote the validity of the DNA results or boost the credibility of the inmates' testimony about Respondent's confession." Admittedly Prodan provides no direct evidence regarding the DNA evidence, but as explained below his erroneously admitted "expert" testimony bolstered both the probability that respondent was the source of the DNA as well as the inmates' testimony relating respondent's "confession." In my view, the critical harmless error question is whether Prodan's erroneously admitted testimony bolstered the State's contention that respondent was the victim's rapist and killer.

Prodan's testimony that the victim probably knew her attacker bolstered the inmates' testimony that respondent had confessed to an ongoing relationship with the victim. Further, Prodan's theory that the victim and her assailant were acquainted served to identify respondent as a likely perpetrator in light of his statement to police that he had been in the apartment, as well as the testimony of the victim's roommate and another witness that the victim was familiar with respondent. Accordingly, Prodan's testimony cannot be said to be harmless, especially given the relative statistical weakness of the DNA evidence.

In respondent's "confession," he did not acknowledge any sexual contact on the night of the killing, but rather told the inmates that he went to the victim's apartment in a jealous frame of mind, having learned his "girlfriend" was sexually involved with a mutual friend. According to the inmates' testimony, respondent confessed his jealous frame of mind escalated to rage as he questioned the woman about the relationship, and resulted in the victim's stabbing. Prodan's

testimony that "the assailant most likely did not come to the apartment for the purpose of killing the victim" bolsters this part of respondent's confession. Prodan's theory that the perpetrator intended to sexually humiliate the victim by posing her body is consistent with respondent's confession that he went to the apartment after learning of the victim's sexual infidelity, and that her responses to his questions about this infidelity led to her assault. Prodan's improperly admitted evidence goes directly to the only issue the jury had to decide: not whether crimes had occurred, but was respondent the perpetrator.

Unlike the majority, I believe that Prodan's improperly admitted "expert" testimony cannot be deemed harmless error. Improper "expert" evidence which goes to the heart of the case is not harmless. *See State v. Ellis,* 345 S.C. 175, 547 S.E.2d 490 (2001); *see also State v. Douglas,* 380 S.C. 499, 671 S.E.2d 606 (2009) (Pleicones, J., dissenting). I would therefore reverse and remand the case for a new trial.