WILLIAMS, J.:
*919 **529 In this criminal appeal, Gerald Rudell Williams appeals his convictions for attempted murder, arguing the circuit court erred in (1) refusing to charge the jury on the lesser included offense of first-degree assault and battery and (2) charging the jury on the doctrine of transferred intent. We affirm.
FACTS/PROCEDURAL HISTORY
This case arises out of an incident on April 13, 2012, in which a double-wide mobile home (the Residence) in Saluda, South Carolina, was shot several times. At the time, Al Jerome Young lived in the Residence, along with Ycedra Williams[1] and her husband, Joseph Wrighton. Prior to the incident, Young agreed to purchase drugs for OJ Charley in exchange for Charley paying Young $26,000 in cash. Young, however, stated he never planned on purchasing any drugs with the money; instead, Young intended to "rip [Charley] off." Following Young and Charley's meeting, Young received a call from Ycedra, who stated a van with five individuals[2] came to the Residence looking for Young, which prompted him **530 to purchase a .40 caliber Smith & Wesson firearm from "a random dude on the street." Ycedra testified the Residence's other occupants[3] recognized something was "going on" with Young and left the Residence out of fear, leaving only Ycedra, Young, and Wrighton at the Residence.
On April 12, 2012, Investigator Robert Shorter, then-chief investigator for Saluda County's sheriff's office, received information from an individual in the Williston Police Department. The individual indicated Charley and others would be traveling from Barnwell County to Saluda County that night seeking to retaliate against some individuals as a result of something that occurred earlier that week. After receiving the tip, Investigator Shorter issued a "be-on-the-lookout" advisement to the night shift officers, warning them of armed and dangerous individuals, including Charley, who were potentially seeking to retaliate against Young. Investigator Shorter further advised officers that Charley was likely heading to the Residence because Young might be hiding there.
Ycedra testified she and Wrighton were in the den of the Residence while Young was in his bedroom that night. Shortly after midnight, Ycedra heard a dog barking, went to look out the window, and saw two people in the driveway approaching the Residence. Ycedra yelled to Young that people were outside, and he told her to turn off the lights. At that point, Wrighton went to the door to check outside and the people began shooting at him. Wrighton ran back into the den, grabbed Ycedra, threw her down to the floor, and lay down with her. Thereafter, Young fired several shots back at the shooters through the door. Once the shooting stopped, Ycedra called the police.
Investigator Shorter testified his office informed him a shooting occurred at the Residence. Law enforcement arrested Williams and OJ Charley shortly after midnight. When Investigator Shorter arrived at the Residence, the scene was secure and officers had Williams and Charley in custody. Investigator Shorter observed multiple bullet holes in the **531 walls and door of the Residence as well as shell casings in the yard and inside the Residence. He also noted the door "had bullet holes going both ways, bullets going in, bullets coming out." *920 On July 9, 2013, a grand jury indicted Williams for three counts of attempted murder. The case was called for a jury trial on October 14, 2013. At trial, Charley testified for the defense. Charley admitted he was involved in the shooting incident at the Residence. He testified that a few days before he participated in the shooting incident, he went to the Residence and met with Young. Charley stated he and Young drove to a laundromat, and once they arrived, Young pointed a gun at Charley and stole $32,000 from him. Charley testified he returned to the Residence the night of the shooting incident with Williams, whom he referred to as the driver. Charley stated he offered to pay Williams to drive and told Williams they were going to see some girls. According to Charley, Williams had no idea the shooting incident was about to take place. Charley stated Williams was also unaware another individual, Rico, was following them in another vehicle. Charley testified he left Williams in the van and met up with Rico, who had two handguns in his possession. Charley stated that as he and Rico approached the Residence, Young opened the front door and fired two shots in the air. Charley stated he then fired a shot in the air and then his gun jammed. He ran back to the van and was soon arrested, but he believed Rico stayed and continued to fire shots toward the Residence.
On cross-examination, the State questioned Charley about the plea deal he received in exchange for testifying against Williams. Charley acknowledged he was double-crossing the State and had lied to the jury on direct examination to help Williams.[4] Charley subsequently testified Williams was entirely **532 aware of Charley's intentions when they went to the Residence and eventually confessed to lying about Rico's involvement in the shooting incident. When asked whether he and Williams went to the Residence to kill Young, Charley stated, "No. I came back to get my money. If killing was in the process, I mean, I don't-I can't say what would have happened, but I did come back to get my money." Additionally, Charley testified Williams had a handgun, participated in the shooting incident, and agreed to help Charley because Charley offered to pay Williams a portion of the money they recovered from Young.
After the defense rested its case, Williams objected to several of the circuit court's jury charges, including an inferred malice charge and a transferred intent charge. Additionally, Williams objected to the circuit court's failure to give a charge on the lesser included offenses of assault and battery of a high and aggravated nature (ABHAN) and first-degree and second-degree assault and battery. The circuit court found all of the evidence in the case "goes to the alleged crime where [Williams] ... shot up [the Residence] with the intent to kill an individual who was within the home and there happened to be two other individuals in there as well." The court found the evidence "devoid of any lesser included offense indicia" and declined to give the requested charges. At the conclusion of the three-day trial, the jury convicted Williams for the attempted murders of Young, Ycedra, and Wrighton. The circuit court sentenced Williams to concurrent terms of twenty years' imprisonment. This appeal followed.
ISSUES ON APPEAL
I. Did the circuit court err in refusing to charge the jury on the lesser included offense of first-degree assault and battery *921 when it charged the jury on attempted murder?
II. Did the circuit court err in charging the jury on the doctrine of transferred intent?
**533 STANDARD OF REVIEW
"In criminal cases, [the appellate court] sits to review errors of law only and is bound by the factual findings of the [circuit] court unless an abuse of discretion is shown." State v. Laney , 367 S.C. 639, 643, 627 S.E.2d 726, 729 (2006). "An abuse of discretion occurs when the conclusions of the [circuit] court either lack evidentiary support or are controlled by an error of law." State v. Pagan , 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006).
LAW/ANALYSIS
I. Lesser Included Offense Charge
Williams first argues the circuit court committed error by refusing to charge the jury on the lesser included offense of first-degree assault and battery when it charged the jury on attempted murder. We agree, but we find this error to be harmless.
"In reviewing jury charges for error, we must consider the [circuit] court's jury charge as a whole in light of the evidence and issues presented at trial." State v. Adkins , 353 S.C. 312, 318, 577 S.E.2d 460, 463 (Ct. App. 2003). The circuit "court is required to charge only the current and correct law of South Carolina." State v. Brandt , 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011) (quoting Sheppard v. State , 357 S.C. 646, 665, 594 S.E.2d 462, 472 (2004) ). "The [circuit court] is to charge the jury on a lesser included offense if there is any evidence from which the jury could infer that the lesser, rather than the greater, offense was committed." State v. Watson , 349 S.C. 372, 375, 563 S.E.2d 336, 337 (2002). "A [lesser included] offense is one whose elements are wholly contained within the crime charged." State v. Dickerson , 395 S.C. 101, 118, 716 S.E.2d 895, 904 (2011). However, even if the elements of the greater offense do not include all the elements of the lesser offense, we may still construe the lesser offense as a lesser included offense if it "has traditionally been considered a lesser included offense of the greater offense." Watson , 349 S.C. at 376, 563 S.E.2d at 338.
Section 16-3-29 of the South Carolina Code (2015) codifies attempted murder and states that "[a] person who, with intent to kill, attempts to kill another person with malice aforethought, **534 either expressed or implied, commits the offense of attempted murder." Section 16-3-600 of the South Carolina Code (2015 & Supp. 2017) codifies the varying degrees of assault and battery, which-in descending order of severity-includes ABHAN and assault and battery in the first, second, and third degree. As relevant to this case, subsection 16-3-600(C)(1) provides:
(1) A person commits the offense of assault and battery in the first degree if the person unlawfully:
(a) injures another person, and the act:
(i) involves nonconsensual touching of the private parts of a person, either under or above clothing, with lewd and lascivious intent; or
(ii) occurred during the commission of a robbery, burglary, kidnapping, or theft; or
(b) offers or attempts to injure another person with the present ability to do so, and the act:
(i) is accomplished by means likely to produce death or great bodily injury;[5 ] or
(ii) occurred during the commission of a robbery, burglary, kidnapping, or theft.
Additionally, subsection 16-3-600(C)(3) provides, "[a]ssault and battery in the first degree is a lesser[ ]included offense of [ABHAN], as defined in subsection (B)(1), and attempted murder, as defined in [s]ection 16-3-29."
*922 We find the facts of this case fit within the confines of subsection 16-3-600(C)(1)(b)(i). Accordingly, we hold the circuit court erred in refusing to charge the lesser included offense of assault and battery in the first degree. See State v. Scott , 414 S.C. 482, 486, 779 S.E.2d 529, 531 (2015) ("The refusal to grant a requested jury charge that states a sound principle of law applicable to the case at hand is an error of law." (quoting State v. Pittman, 373 S.C. 527, 570, 647 S.E.2d 144, 167 (2007) ) ). Thus, the dispositive question is whether the circuit court's error affected the results of the trial.
**535 "Errors, including erroneous jury instructions, are subject to harmless error analysis." State v. Belcher , 385 S.C. 597, 611, 685 S.E.2d 802, 809 (2009). The circumstances of a particular case dictate whether an error is harmless. State v. Tapp , 398 S.C. 376, 389, 728 S.E.2d 468, 475 (2012). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it could not reasonably have affected the result of the trial." Id. (internal quotation marks omitted) (quoting State v. Mitchell , 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) ). "When considering whether an error with respect to a jury instruction [is] harmless, [the appellate court] must determine beyond a reasonable doubt that the error complained of did not contribute to the verdict." State v. Middleton , 407 S.C. 312, 317, 755 S.E.2d 432, 435 (2014) (internal quotation marks omitted) (quoting State v. Kerr , 330 S.C. 132, 144-45, 498 S.E.2d 212, 218 (Ct. App. 1998) ). Moreover, when considering harmless error, the appellate court's analysis is focused on whether the erroneous charge contributed to the verdict rendered, not what the verdict would have been had the circuit court correctly charged the jury. Id. "[W]e must review the facts the jury actually heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict." State v. Jefferies , 316 S.C. 13, 22, 446 S.E.2d 427, 432 (1994).
Williams asserts the circuit court committed reversible error. Williams argues that, under the any evidence standard and when viewing facts in the light most favorable to Williams, the jury could have concluded Williams lacked malice because no one was injured and Charley testified Young shot first. Conversely, the State contends the error was harmless because the only conclusion established by the evidence was Williams possessed malice aforethought and intended to kill the victims.
We find our supreme court's analysis in Middleton to be instructive in resolving this issue. See 407 S.C. at 317-19, 755 S.E.2d at 435-36. In Middleton , the supreme court affirmed the appellant's convictions for two counts of attempted murder and one count of possession of a weapon during the commission of a violent crime. See id. at 314, 755 S.E.2d at 433.
**536 There, the appellant requested a jury charge on the lesser included offense of assault and battery in the first degree on both counts of attempted murder, but the circuit court only charged the jury on the lesser included offense as to the injured victim and refused to charge the lesser included offense as to the uninjured victim. Id. at 314-15, 755 S.E.2d at 434. Although the circuit court erred in refusing to charge the jury on the lesser included offense of assault and battery in the first degree, the supreme court found the error was harmless beyond a reasonable doubt. Id. at 319, 755 S.E.2d at 436. Specifically, the supreme court found the jury could only reach the conclusion that the appellant attempted to murder the victims because the evidence presented at trial showed the appellant deliberately approached the passenger side of the car containing the victims and shot at least five times into the car, and the victim testified to escaping injuries because he jumped into the driver's seat and ran the appellant off the road. Id. Thus, in light of this evidence, the court noted the erroneous jury charge did not contribute to the verdict beyond a reasonable doubt. Id.
Similarly, in the instant case, we find the circuit court's error did not contribute to the verdict beyond a reasonable doubt because the evidence presented at trial yielded only the conclusion that Williams acted with malice aforethought and attempted to commit murder. Moreover, the circuit court instructed *923 the jury on the charges of malice, malice aforethought, expressed malice, and inferred malice. Specifically, the court stated malice is "hatred or ill will or hostility towards another person" and is "the intentional doing of a wrongful act without just cause or excuse and with an intent to inflict an injury or under circumstances that the law will infer an evil intent." The court instructed malice aforethought "must exist in the mind of the defendant just before and at the time that the act is committed" and may be "expressed or inferred." The court stated malice may be inferred[6] "from conduct that shows a total disregard for **537 human life" and may arise when the act is "performed with a deadly weapon."[7] Finally, the court stated "[i]f facts are proved beyond a reasonable doubt sufficient to raise an inference of malice to [the jury's] satisfaction, this inference would be simply an evidentiary fact to be considered by ... the jury, along with the other evidence in the case" and informed the jury it was free to give the evidence the weight it deemed necessary.
In the instant case, with regard to the evidence, Charley testified Williams (1) was aware of the circumstances leading up to the shooting incident at the Residence; (2) had a handgun and participated in the shooting; and (3) agreed to help Charley in exchange for a portion of the money. Further, the victims testified to being shot at numerous times through the door and walls of the Residence. Last, evidence demonstrated Williams was present at the scene of the crime and possessed a firearm. This evidence supports the jury's findings that Williams had malice aforethought and intended to kill the victims.
In light of the charges and the facts presented at trial, the only conclusion the jury could draw from the evidence was that Williams acted with malice aforethought and was guilty of attempted murder of the victims. Therefore, we find the circuit court's error did not contribute to the verdict beyond a reasonable doubt.
II. Transferred Intent Charge[8]
Williams next argues the circuit court erred in charging the jury on transferred intent. We disagree.
**538 "Criminal liability is normally based upon the concurrence of two factors, 'an evil-meaning mind [and] an evil-doing hand....' " United States v. Bailey , 444 U.S. 394, 402, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (alterations in original) (quoting Morissette v. United States , 342 U.S. 246, 251, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ). "A defendant may not be convicted of a criminal offense unless the State proves beyond a reasonable doubt that he acted with the criminal intent, or mental state, required for a particular offense." State v. Fennell , 340 S.C. 266, 271, 531 S.E.2d 512, 515 (2000). "In general, '[a]ttempt is a specific intent crime.' ... 'The act constituting the attempt must be done with the intent to commit that particular crime.' " State v. Sutton , 340 S.C. 393, 397, 532 S.E.2d 283, 285 (2000) (alteration in original) (quoting 21 AM. JUR. 2DCriminal Law § 176 (1998) (current version § 150) ). As related to "attempt" crimes, specific intent means "the defendant consciously intended the completion of acts comprising the choate offense." Id .
*924 In South Carolina, attempted murder requires proving the specific intent[9] to commit murder. See State v. King , Op. No. 27744 (S.C. Sup. Ct. filed Oct. 25, 2017) (Shearouse Adv. Sh. No. 40 at 27-28, 35) (finding the circuit court erred in charging the jury that attempted murder is a general intent crime and requiring proof of a specific intent to kill as an element of attempted murder). "The doctrine of transferred intent applies only in the situation of the same intended harm inflicted on an unintended victim." State v. Bryant , 316 S.C. 216, 219, 447 S.E.2d 852, 854 (1994).
In the instant case, Williams asserts that because attempted murder is a specific intent crime, any intent he had to kill Young could not be transferred to other victims. In response, the State contends Williams had specific intent when he committed the crime of attempted murder. Moreover, the **539 State argues Williams' specific intent applied to all three victims "because specific intent does not exclude crimes to other victims." We find that charging the doctrine of transferred intent is proper to convict a defendant of attempted murder regardless of whether a victim, intended or unintended, suffers an injury.
Historically, South Carolina courts have applied the doctrine of transferred intent in finding a defendant guilty of manslaughter or murder, typically applying it when the defendant, acting with malice and an intention to kill one person, misses his intended target and mistakenly kills an unintended victim. In these cases, the defendant's criminal intent to kill the intended victim-his mental state of malice-transfers to an unintended victim. See State v. Heyward , 197 S.C. 371, 377, 15 S.E.2d 669, 672 (1941) (affirming murder conviction of a defendant who mistakenly shot and killed a police officer when the defendant believed the officer to be an assassin sent by a former employer); id. ("If there was malice in appellant's heart, he was guilty of the crime charged, it matters not whether he killed his intended victim or a third person through mistake."); see also WILLIAM SHEPARD MCANINCH ET AL., THE CRIMINAL LAW OF SOUTH CAROLINA 18-19 (6th ed. 2013) ("[A]ll that is required for murder is mental state of malice, provided here by the intent to kill a human being, coupled with an act which caused the death of a human being.").
In Fennell , our supreme court stated the term transferred intent was "somewhat misleading" and provided clarification for its meaning, explaining:
The defendant's mental state, or mens rea , whatever it may be at the time he allegedly commits a criminal act, is contained within the defendant's brain when he commits the act. That mental state never leaves the defendant's brain; it is not "transferred" from the defendant's brain to another person or place. A more apt description might be that the mental state is like a spotlight emanating from its source-the defendant's mind-to its target-the intended victim.
Nor is that mental state in limited supply. The mental state "spotlight" is not extinguished at the moment a bullet strikes and kills the intended victim, such that there is no **540 mental state left upon which to convict an unintended victim who also is injured or killed.
340 S.C. at 271, 531 S.E.2d at 515. Applying this analogy, the court found that, unlike other jurisdictions, South Carolina law required applying the doctrine of transferred intent to convict a defendant of assault and battery with the intent to kill (ABIK) when the defendant killed his intended victim and merely injured an unintended victim.[10]
*925 Id. at 274, 276, 531 S.E.2d at 516, 517 ("A person who, acting with malice, unleashes a deadly force in an attempt to kill ... an intended victim should anticipate that the law will require him to answer fully for his deeds when that force kills or injures an unintended victim.").
We are unaware of another South Carolina case that addresses a factual scenario similar to that of the instant case, in which the circuit court charged the jury with the doctrine of transferred intent when a defendant was charged with attempted murder of an intended and unintended victim but neither the intended nor unintended victims were injured. We apply the doctrine of transferred intent in this instance in accord with South Carolina jurisprudence. Other jurisdictions vary when deciding whether to apply the doctrine of transferred intent to attempted murder cases;[11] however, similar to **541 Fennell , we recognize South Carolina's criminal laws require the imposition of the doctrine of transferred intent. See Fennell , 340 S.C. at 273-74, 531 S.E.2d at 517. Furthermore, as long as the State has shown the specific intent to kill or commit a murder, the identity of the victim is irrelevant. See Heyward , 197 S.C. at 377, 15 S.E.2d at 672 ("If there was malice in appellant's heart, he was guilty of the crime charged, it matters not whether he killed his intended victim or a third person through mistake.").
Initially, we note South Carolina does not require a victim be injured to convict a defendant of attempted murder. See S.C. Code Ann. § 16-3-29 ("A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder."); Middleton , 407 S.C. at 314-15, 755 S.E.2d at 433-34 (affirming the conviction of attempted murder against an uninjured victim). Moreover, we find Williams misconstrues the attempted murder statute to the extent he argues the statute requires the specific intent to murder specific victims.
**542 Williams specifically argues the transferred intent charge erroneously allowed the jury to find Williams guilty of attempted murder of Ycedra and Wrighton without requiring the State to prove (1) Williams knew they were in the Residence and (2) Williams specifically intended to kill Ycedra and Wrighton, in addition to Young. We disagree.
Section 16-3-29 does not require a specific victim; instead, it states a "person who, with the intent to kill, attempts to kill another person" is guilty of attempted murder. See S.C. Code Ann. § 16-3-29 (emphasis added).
*926 Furthermore, the requisite specific intent for attempted murder is the specific intent to commit murder. See King , Op. No. 27744 (S.C. Sup. Ct. filed Oct. 25, 2017) (Shearouse Adv. Sh. No. 40 at 27-28, 35). Murder is defined as "the killing of any person with malice aforethought, either express or implied," and does not require a specific victim be killed. See S.C. Code Ann. § 16-3-10 (2015) (defining murder); see also Fennell , 340 S.C. at 276, 531 S.E.2d at 517 (finding the defendant's state of mind is more important than the identity of the victim in convicting a defendant of homicide); Heyward , 197 S.C. at 377, 15 S.E.2d at 672. Finally, the specific intent to kill can be inferred by the surrounding circumstances of the case, including the use of a deadly weapon and the character of the attack. See Sutton , 340 S.C. at 397 n.5, 532 S.E.2d at 285 n.5.
In the instant case, evidence supports the finding that Williams and Charley specifically intended to commit murder. In particular, testimony established Williams went to the Residence with a loaded weapon, intended to get Charley's money back from Young, and was fully aware of the reason for visiting the Residence. Additionally, testimony indicated Williams fired multiple shots into the walls and doors of the Residence after Ycedra informed Young of someone being outside the Residence and after Wrighton-albeit as a silhouetted figure-appeared at the door of the Residence. We find the evidence indicates Williams went with Charley to the Residence intending to kill Young to get Charley's money back, and Williams' actions of firing multiple shots at a dark figure standing in a door represented an attempt to kill another person with malice aforethought. See S.C. Code Ann. § 16-3-29 ("A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or **543 implied, commits the offense of attempted murder."); see also Sutton , 340 S.C. at 397, 532 S.E.2d at 285 ("In the context of an 'attempt' crime, specific intent means that the defendant consciously intended the completion of acts comprising the choate offense.").
The evidence also indicated Charley was aware Young did not live alone at the Residence. Thus, Williams' use of deadly force in attempting to kill Young would warrant the transferred intent charge as to Ycedra and Wrighton because it was foreseeable that Young would not be alone, especially when considering Young lived at the Residence with several other people. See Fennell , 340 S.C. at 276, 531 S.E.2d at 517 ("A person who, acting with malice, unleashes a deadly force in an attempt to kill ... an intended victim should anticipate that the law will require him to answer fully for his deeds when that force kills or injures an unintended victim."); id. at 272, 531 S.E.2d at 515 (finding in a typical case of transferred intent, "[a]lthough the defendant did not act with malice toward the unintended victim, the defendant's criminal intent to kill the intended victim ... is transferred to the unintended victim").
Therefore, in light of the evidence and case law supporting transferred intent being charged to the jury, we find the circuit court did not err in charging transferred intent.
CONCLUSION
In conclusion, we find the circuit court committed harmless error in refusing to charge the jury on the lesser included offense of first-degree assault and battery. Moreover, we find the circuit court did not err in charging transferred intent to the jury. Thus, based on the foregoing analysis, Williams' convictions for attempted murder are
AFFIRMED.
KONDUROS, J., and LEE, A.J., concur.

Ycedra and Williams were second cousins. However, Ycedra testified she had not had much contact with Williams since they were young, and furthermore, she had not spoken with him at all in the months prior to the April 2012 shooting incident.

Ycedra testified Williams was not one of the individuals in the van.

The following individuals also lived in the Residence with Young, Ycedra, and Wrighton: Young's sister, Felicia Barlow; her husband, Michael Barlow; the Barlow's three children; and Ycedra's stepbrother, Frank Gonzalez.

Charley's description of the shooting incident changed several times during cross-examination, and he admitted he was lying after the State informed Charley he could be charged with perjury. Specifically, the following occurred on recross-examination:
[The State]: Are you trying now to hedge your bet and work yourself out some deal on the back side of this now and say you got some deal in hopes it'll get you a lighter sentence?
[Charley]: No sir. I'm just-I'm telling the truth. I mean, I tried to help-tried to help him out. And this-I mean, the right thing to do is just tell the truth.
[The State]: And you tried to help your co-defendant by getting up here and lying, bald-faced lying, to 12 people, didn't you? More than 12, but 12 actual jurors?
[Charley]: Yes, sir, I did. It's wrong. I'm wrong. I'm sorry. I mean, that's just-it is what it is, a lie. I apologize and it's not right.

"Great bodily injury" is defined as "bodily injury which causes a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of a bodily member or organ." S.C. Code Ann. § 16-3-600(A)(1).

Williams did not appeal the inferred malice jury charge. Thus, the circuit court's ruling on this issue is the law of the case and cannot be considered by this court. See State v. Black , 400 S.C. 10, 28, 732 S.E.2d 880, 890 (2012) (holding an unchallenged ruling, right or wrong, becomes the law of the case and will not be considered by the appellate court).

The circuit court charged the jury that a firearm may be considered a deadly weapon.

The circuit court gave a transferred intent charge to assist the jury with its deliberations regarding whether Williams was guilty of the attempted murders of Ycedra and Wrighton. Williams objected to this charge, and the circuit court responded by describing the case as "a situation where the defendant is accused of shooting into a house where individuals may have been, that he did not know were there, that is giving him the benefit of the facts of the case." The circuit court explained it gave the charge because it was "concerned that the jury may believe, after charging that intent is necessary, that [Williams] had no intent to harm those individuals."

"A specific intent to kill may be, and normally is, inferred from the surrounding circumstances, such as the character of the attack, the use of a deadly weapon, and the nature and extent of the victim's injuries." Sutton , 340 S.C. at 397 n.5, 532 S.E.2d at 285 n.5.

In Fennell , the supreme court determined the required mental state for ABIK was the same as that for murder-malice aforethought-whereas for an ABHAN conviction, the State was not required to prove malice. 340 S.C. at 275, 531 S.E.2d at 517. The court found that, although the record showed the appellant did not act with malice toward the unintended victim and was angry with the intended victim, a stray bullet happened to strike the unintended victim while the appellant killed the intended victim. Id. As a result, the court held the doctrine of transferred intent was the only way the State could show appellant acted with malice toward the unintended victim and obtain a conviction and sentence for ABIK rather than ABHAN. Id. at 275-76, 531 S.E.2d at 517.

Compare State v. Brady , 745 So.2d 954, 957 n.4, 958 (Fla. 1999) (finding "no need to resort to the doctrine of transferred intent" when the facts supported the conviction of attempted second-degree murder, but listing cases from several jurisdictions in which courts used transferred intent to affirm convictions when the crime required proof of an intent to kill), id. ("[S]o long as there is evidence of an intent to kill, it makes no difference that someone other than the intended victim was killed or injured."), State v. Rodriguez-Gonzales , 164 Ariz. 1, 790 P.2d 287, 288 (Ct. App. 1990) ("[T]ransferred intent addresses the circumstances surrounding an attempted crime as the actor believes them to be, i.e., where the actor's belief about some facts varies from the actual circumstances only insofar as there is a different victim or different harm. Intent to murder is transferable to each unintended victim once there is an attempt to kill someone."), and State v. Gillette , 102 N.M. 695, 699 P.2d 626, 636 (Ct. App. 1985) (affirming three convictions of attempted murder when a defendant sent a poisoned drink to an intended victim, and the intended victim and two others ingested the drink but were not injured; finding defendant's felonious intent to kill transferred to others who foreseeably would ingest the poison), with Harrison v. State , 382 Md. 477, 855 A.2d 1220, 1237 (2004) (listing cases from several jurisdictions that have rejected the doctrine of transferred intent in relation to the crime of attempted murder of an unintended victim), id. (holding "the theory of transferred intent applies only when a bystander has suffered a fatal injury" and finding this holding "comports with numerous other jurisdictions [that] have considered the issue [because it] avoids the numerous logical hurdles that arise when 'transferred intent' is applied to inchoate offenses"), People v. Bland , 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, 1117 (2002) ("Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder-due to transferred intent-if the person were killed."), and id. ("Someone who intends to kill only one person and attempts unsuccessfully to do so[ ] is guilty of attempted murder of the intended victim, but not the others.").