# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Gerald Rudell Williams, Petitioner.

Appellate Case No. 2018-000994

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Saluda County
J. Michael Baxley, Circuit Court Judge

---

Opinion No. 27893
Heard March 26, 2019 – Filed June 12, 2019

---

## AFFIRMED AS MODIFIED

---

Appellate Defender David Alexander, of Columbia, for
Petitioner.

Attorney General Alan McCrory Wilson and Assistant
Attorney General William F. Schumacher IV, both of
Columbia, and Solicitor S.R. Hubbard III, of Lexington,
all for Respondent.

---

**JUSTICE KITTREDGE:**      In this case, the Court is asked whether and to
what extent the common law doctrine of transferred intent applies to the newly-
codified crime of attempted murder.  Petitioner Gerald Williams was convicted of

three counts of attempted murder related to his alleged shooting into an occupied mobile home where he knew his intended victim was present, but did not realize two other individuals were also present.

Under the common law, transferred intent makes a whole crime out of two halves by joining the intent to harm one victim with the actual harm caused to another. Normally, transferred intent applies to general-intent crimes. However, attempted murder is a specific-intent crime in South Carolina, and we have not yet addressed whether transferred intent may supply the requisite *mens rea* for such a crime.

Because this case was tried without objection as a general-intent crime, we find the doctrine of transferred intent applies in this instance. We therefore decline to address the applicability of transferred intent to a specific-intent crime such as attempted murder and vacate the portion of the court of appeals' opinion dealing with this issue. Additionally, looking specifically at the facts of this case, we find no error in failing to charge the jury on the lesser-included offense of assault and battery in the first degree (AB-1st). We therefore affirm the court of appeals as modified.

## I.

This case arose after one drug dealer, Al Young, stole $32,000 from another drug dealer, O.J. Charley. The night of the shooting, police were tipped off that Charley and others planned to retaliate against Young that night and would be armed and dangerous. The Saluda County Sheriff's Office issued a "be on the lookout" (BOLO) alert for a teal-green Ford Windstar minivan registered to Charley's wife and coming from Barnwell County to Saluda County. It also informed local law enforcement officers of the address of Young's mobile home as the possible location of the retaliatory act.

According to the State's witnesses, shortly after midnight, Young and two of his roommates—a married couple named Ycedra Williams[1] and Joseph Wrighton— saw two men walking down the driveway. Young told Williams to turn off the lights while Wrighton went to the door and tried to identify the men. The door contained a large glass panel through which at least the silhouette of an individual would be visible from the outside. As soon as Wrighton appeared in the door, the

---

[1] Ycedra Williams is Petitioner's (Gerald Williams) second cousin. For clarity's sake, we will refer to Ycedra Williams as "Williams," and Gerald Williams as "Petitioner."

men began shooting, both directly at him and all along the side of the mobile home.  Williams called 911, but before the police arrived, the shooters fled the scene, abandoning their firearms and two sets of latex gloves (a blue pair and a purple pair) nearby.  The purple latex gloves were torn and missing the portions that would cover the thumb and index finger.

Two sheriff's officers responded to the 911 call.  On their way to the mobile home, the officers noticed a minivan matching the BOLO description parked on the side of the road approximately a block or two away from the mobile home.  The officers stopped for around twenty seconds, during which they asked the dispatcher to check the license plate number of the van; checked the van for occupants, including pulling on the door handles to confirm they were locked; and verified the van did not have a flat tire or other obvious signs of being disabled.  The dispatcher confirmed the van belonged to Charley's wife.  Concerned the van would be used as "the get-away vehicle," the officers notified a nearby Saluda Police Department officer of the van's presence and requested the town officer watch the vehicle so the two sheriff's officers could continue responding to the 911 call.

A minute or two later, upon arriving at the van, the town officer saw Charley lying in a ditch beside the van.  When the officer turned on his blue lights and high beams, Charley stood up and got into the passenger side of the van, and the van immediately drove off.  After a short chase, the officer was able to force the van to stop and arrested the driver (Petitioner) and Charley.  After Petitioner and Charley were transported to the jail, two finger-pieces from a purple latex glove were pulled off of Petitioner's thumb and index fingers.

At trial, the State presented testimony from various law enforcement officers about the events surrounding the night of the shooting and the investigation following the incident.  Those officers testified there were additional pieces of a purple latex glove found in the van following Petitioner's arrest, and all of the pieces of purple latex glove—those lying next to the firearms, those found in the van, and those found on his fingers at jail—tested positive for Petitioner's DNA.  The law enforcement officers also testified that after receiving Williams's 911 call, they organized a search using bloodhounds to ascertain whether there was a third, unidentified shooter that remained at large; however, the bloodhound search uncovered no trace of anyone besides Charley and Petitioner.  The State presented no evidence Petitioner was aware Williams or Wrighton (or anyone else other than Young) was in the mobile home at the time of the shooting.

During his own case-in-chief, Petitioner called Charley to testify.  Charley's testimony varied wildly between direct and cross-examination, setting out three

distinct stories.[2]  In the first version of events, Charley testified he did not have a driver's license, so he paid Petitioner to drive him to Saluda in order to "see some girls."  Charley stated Petitioner did not know anything about the shooting and did not participate in it.

In the second version of events—after the State reminded Charley he had pled guilty to attempted murder for the shooting but had not been sentenced pending his cooperation with the investigation and Petitioner's trial—Charley testified Petitioner had driven Charley to Saluda and accompanied him to Young's mobile home.  However, Charley claimed Petitioner was unarmed and did not participate in the shooting.  Charley asserted that, rather than Petitioner, a third man (Charley's co-worker) had been the other shooter.

In the third version of events—after the State reminded Charley of the potential for a perjury charge—Charley testified Petitioner agreed to assist Charley the night of the shooting in exchange for either money or drugs.  Charley stated he and Petitioner were both armed and wearing latex gloves when they approached the mobile home, but claimed Young started the gunfight by coming outside and firing his gun twice into the air.  Charley maintained that in return, he shot one time in the air, but his weapon malfunctioned, and he therefore ran away.[3]  Charley asserted Petitioner nonetheless shot at Young and/or the mobile home repeatedly, agreeing with the State that, given the number of bullet holes in the mobile home's door and siding, Petitioner "tore that house up from one end to the other with his [gun] and emptied" the magazine.  Charley stated that, after his arrest, he decided to cooperate with law enforcement against Petitioner because the fact that Petitioner was discovered in jail still wearing pieces of the gloves they had worn and discarded with the guns was impossible to explain or overcome.

During closing arguments, the State discussed the doctrine of transferred intent extensively.  Petitioner did not object to any of the State's references to the applicability of transferred intent or argue transferred intent did not apply to attempted murder and/or a specific-intent crime.

The trial court then charged the jury on the law, stating in relevant part:

---

[2] After the trial, the trial judge described Charley as "probably the most noncredible witness I think I've ever seen in 14 years of this job."

[3] Law enforcement officers confirmed that one of the weapons found near the latex gloves had malfunctioned and was inoperable.

[Criminal] intent may be transferred in the commission of a crime. Stated differently and using the charge of robbery as an example, if an individual intends to rob a particular person, but somehow by mistake actually robs a different person, the defendant still has the intent to commit robbery. The criminal intent is merely transferred from the original person the defendant desired to rob to the individual the defendant actually robbed. In other words, it is not a defense to the crime that the wrong person was robbed.

. . . .

. . . In order to prove [attempted murder], the State must first prove the defendant attempted to kill another person with malice aforethought, either expressed or implied.

. . . .

Malice may be inferred . . . from conduct that shows a total disregard for human life. Inferred malice may also arise when the deed is done with a deadly weapon. . . .

. . . .

*A specific intent to kill is not an element of attempted murder, but there must be a general intent to commit serious bodily injury.*[4] Intent means intending the result that actually occurs, not accidentally or involuntarily. Intent may be shown by acts and conducts of the defendant and other circumstances from which you may naturally and reasonably infer intent.

. . . Intent may also be inferred when it is demonstrated that the defendant voluntarily and willfully commits an act, the natural tendency of which is to destroy another's life.

(Emphasis added.)

---

[4] *But see State v. King*, 422 S.C. 47, 55–56, 810 S.E.2d 18, 22 (2017) (holding the statutory crime of attempted murder, newly codified in 2010, required a specific intent to kill). Petitioner's case was tried before we issued our decision in *King*, but after the 2010 codification.

Petitioner raised a brief objection to the transferred intent charge, arguing, in its entirety:

> Generally speaking, transferred intent is . . . shooting at a specific person and missing and hitting another.  I don't believe that the facts of this case support that charge.  You know, here I think it's stated that the theory of malice [is met] just because there is a shooting.  And we would respectfully object to the transfer[red] intent charge.

However, Petitioner made no mention of the trial court's instruction that attempted murder was a general-intent crime, or that transferred intent did not apply to specific-intent crimes like attempted murder.[5]  The trial court overruled the objection, finding this was "a situation where the defendant is accused of shooting into a house where individuals may have been, that he did not know were there, that is giving him the benefit of the facts of the case."  The trial court explained that, absent the transferred intent charge, the jury might be confused as to whether Petitioner needed to specifically intend to harm the specific victims, so it felt the charge was appropriate.

Petitioner also objected to the trial court's refusal to give instructions as to the lesser-included offense of AB-1st, asserting the charge was appropriate because none of the victims was injured.[6]  The State opposed the charge, arguing the two theories of the case were that Petitioner either was not present (because he was solely Charley's driver) or he "was completely involved in it."  According to the State, there was no middle ground:  either Petitioner was guilty of attempted murder, or not guilty of anything.  The trial court agreed with the State, explaining,

> All the evidence in this case, both direct and circumstantial, goes to the alleged crime where the defendant . . . shot up a mobile home with the intent to kill an individual who was within the home and there happened to be other individuals there as well.

---

[5] To be fair to counsel, at the time of Petitioner's trial, we had not yet handed down our decision in *King*, in which a majority of this Court held attempted murder was a specific-intent crime.

[6] *Compare* S.C. Code Ann. § 16-3-29 (2015) (describing the offense of attempted murder), *with* S.C. Code Ann. § 16-3-600(C) (2015) (describing the offense of AB-1st).

. . . .

The evidence is devoid of any lesser included offense indicia.

Ultimately, after deliberating for less than an hour, the jury convicted Petitioner of three counts of attempted murder, and the trial court sentenced him to three concurrent terms of twenty years' imprisonment.

Petitioner appealed, arguing the trial court erred in refusing to charge the jury on AB-1st, as a lesser-included offense to attempted murder; and the trial court further erred in charging the jury on the doctrine of transferred intent. Notably, Petitioner did not argue the trial court erred in instructing the jury that attempted murder was a general-intent crime to which transferred intent applied, or that he (Petitioner) was entitled to a new trial based on that error of law alone. *See King*, 422 S.C. at 53–56, 70, 810 S.E.2d at 21–22, 30 (holding attempted murder is a specific-intent crime, and affirming the court of appeals' reversal of the defendant's attempted murder conviction after the trial court instructed the jury that (1) attempted murder was a general-intent crime, and specific intent to kill was not an element of attempted murder; (2) inferred malice may arise when the act is done with a deadly weapon; and (3) malice may be inferred from conduct showing a total disregard for human life).

The court of appeals affirmed Petitioner's convictions. *State v. Williams*, 422 S.C. 525, 812 S.E.2d 917 (Ct. App. 2018). In particular, the court of appeals found any error in failing to charge the jury on AB-1st was harmless because the evidence presented at trial yielded only the conclusion that Petitioner committed the greater, not the lesser, offense. *Id.* at 535–37, 812 S.E.2d at 922–23. Without addressing the trial court's charge to the jury that attempted murder was a general-intent crime, the court of appeals held attempted murder was a specific-intent crime, but "the requisite specific intent for attempted murder is the specific intent to commit murder," not the specific intent to murder a specific person, as Petitioner argued. *Id.* at 541–42, 812 S.E.2d at 925–26. Thus, the court of appeals concluded the doctrine of transferred intent was appropriate and applicable in that instance. *Id.* at 541–43, 812 S.E.2d at 925–26.

We granted Petitioner's petition for a writ of certiorari to review the court of appeals' decision.

## II.

Petitioner first contends the court of appeals erred in finding harmless error in the trial court's failure to charge the jury on AB-1st, as a lesser-included offense to

attempted murder.  We disagree.

In reviewing jury charges for error, we examine the trial court's charge as a whole in light of the evidence and issues presented at trial.  *State v. Mattison*, 388 S.C. 469, 478, 697 S.E.2d 578, 583 (2010) (citation omitted).  "The trial court is required to charge a jury on a lesser-included offense if there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed."  *Suber v. State*, 371 S.C. 554, 559, 640 S.E.2d 884, 886 (2007) (citation omitted) (internal quotation marks omitted).  In determining whether the evidence requires a charge on a lesser-included offense, we view the facts in the light most favorable to the defendant.  *State v. Byrd*, 323 S.C. 319, 321, 474 S.E.2d 430, 431 (1996).

Here, there were three distinct theories of Petitioner's involvement in the shooting.[7] However, regardless of which version of events a jury believed, it could not have found Petitioner guilty of the lesser, rather than the greater, offense.  *See, e.g.*, *State v. Drayton*, 293 S.C. 417, 428, 361 S.E.2d 329, 335 (1987) (holding the trial court did not err in failing to charge the lesser-included offense because, under the State's version of the facts, the defendant was guilty of the greater offense, and under the defendant's version of the facts, he was innocent of any charge).  Accordingly, we find the trial court did not err in failing to charge the jury on the lesser-included offense.

## III.

Petitioner next argues the court of appeals erred in finding the doctrine of transferred intent applied to a specific-intent crime such as attempted murder.  However, Petitioner has never challenged the trial court's instruction to the jury that "*[a] specific intent to kill is not an element of attempted murder*, but there must be a general intent to commit serious bodily injury." (Emphasis added.)[8]  As

---

[7] Charley later recanted two of the three versions of events surrounding Petitioner's involvement.  However, given that we must view the evidence in the light most favorable to Petitioner, we cannot discount these versions despite Charley's credibility issues.  *See Suber*, 371 S.C. at 559, 640 S.E.2d at 886; *Byrd*, 323 S.C. at 321, 474 S.E.2d at 431.  Rather, it is solely for the factfinder to weigh the evidence, including making credibility determinations.

[8] Similarly, Petitioner never contested the trial court's instructions that implied malice would satisfy the *mens rea* requirement for attempted murder, or that malice could be inferred from the use of a deadly weapon.  *See King*, 422 S.C. at

a result, this instruction has become the law of this case. *See Smith v. State*, 413 S.C. 194, 196, 775 S.E.2d 696, 697 (2015) (explaining an unappealed ruling, whether right or wrong, is the law of the case (quoting *Atl. Coast Builders & Contractors, L.L.C. v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012)).

It is well-settled in South Carolina that the doctrine of transferred intent applies to general-intent crimes. *See, e.g.*, *State v. Fennell*, 340 S.C. 266, 271–73, 275–76, 531 S.E.2d 512, 515–16, 517 (2000); *State v. Heyward*, 197 S.C. 371, 376–77, 15 S.E.2d 669, 672 (1941). We therefore find no error in the trial court instructing the jury regarding the applicability of transferred intent to a "general-intent" crime.[9] Because the court of appeals treated the case as if it had been tried as a specific-intent crime, we vacate the portion of its opinion dealing with the issue of transferred intent and leave for another day the determination of whether the doctrine applies to attempted murder.

## IV.

---

64 n.5, 810 S.E.2d at 27 n.5 (explaining implied malice is "arguably inconsistent with a specific-intent crime. *See Keys v. State*, . . . 766 P.2d 270, 273 ([Nev.] 1988) (stating 'one cannot *attempt* to kill another with implied malice because there is no such criminal offense as an attempt to achieve an unintended result' (citation and internal quotation marks omitted)). Moreover, if there is no evidence that one charged with attempted murder had express malice and a specific intent to kill, we believe the crime would involve a lower level of intent and, thus, would fall within the lesser degrees of assault and battery offenses codified in section 16-3-600.").

[9] Moreover, we find the doctrine of transferred intent unnecessary to sustain the convictions for the attempted murders of Young and Wrighton. Petitioner was alleged to have specifically intended to kill Young the night of the shooting, and to have shot at the door where Wrighton stood, intending to kill the figure in the doorway. It matters not that Petitioner may have been unaware it was Wrighton in the door, rather than Young. Simply put, Petitioner *intended* to shoot the person (Wrighton) who appeared in the doorway. As a result, we alternatively sustain Petitioner's convictions for the attempted murders of Young and Wrighton without resort to the doctrine of transferred intent. Because Petitioner was sentenced to three concurrent twenty-year sentences, reversing his conviction for the attempted murder of Williams would have no effect on the length of Petitioner's term of imprisonment, and we decline to do so, particularly given that the case was tried as if attempted murder was a general-intent crime.

Petitioner's attempted murder case was tried, without objection, as a general-intent crime, and that unappealed ruling has become the law of the case.  Because it is well-established in our state that transferred intent applies to general-intent crimes, we find no error in the trial court's decision to charge the jury on the doctrine of transferred intent.  We further find no error in the trial court's refusal to charge the jury on AB-1st, as a lesser-included offense to attempted murder.  We therefore affirm the court of appeals decision as modified and vacate the portion of its decision dealing with the issue of transferred intent.

**AFFIRMED AS MODIFIED.**

**HEARN, FEW and JAMES, JJ., concur.  BEATTY, C.J., concurring in result only.**